**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

WANDA GREENWOOD; LADELLE
HATFIELD; DEBORAH MCCLEESE, on
behalf of themselves and other
similarly situated,
            *Plaintiffs-Appellees,*

v.

COMPUCREDIT CORPORATION and
COLUMBUS BANK AND TRUST,
jointly and individually,
            *Defendants-Appellants.*

No. 09-15906

D.C. No.
4:08-cv-04878-CW

OPINION

Appeal from the United States District Court
for the Northern District of California
Claudia Wilken, District Judge, Presiding

Argued and Submitted
April 12, 2010—San Francisco, California

Filed August 17, 2010

Before: Andrew J. Kleinfeld, A. Wallace Tashima, and
Sidney R. Thomas, Circuit Judges.

Opinion by Judge Thomas;
Dissent by Judge Tashima

12071

## COUNSEL

Susan L. Germaise, McGuireWoods LLP, Los Angeles, California, David L. Hartsell, McGuireWoods LLP, Chicago, Illinois, James R. McGuire, Morrison & Foerster LLP, San Francisco, California, Tim A. O'Brien, Morrison & Foerster LLP, Washington, D.C., for the defendants-appellants.

Adrian Barnes, Gilbert & Sackman, Los Angeles, California, W. Lloyd Copeland, Taylor-Martino-Zarzaur, PC, Mobile, Alabama, for plaintiffs-appellees.

## OPINION

THOMAS, Circuit Judge:

This appeal presents the question, *inter alia*, as to whether the word "sue," as used in the Credit Repair Organization Act ("CROA"), means "arbitrate." Or, perhaps the question is, as Alice put it: "whether you can make words mean so many different things?"[1] We conclude that Congress meant what it said in using the term "sue," and that it did not mean "arbitrate." We affirm the order of the district court denying the Credit Providers' motion to compel arbitration.

---

[1]Lewis Carroll, THROUGH THE LOOKING GLASS AND WHAT ALICE FOUND THERE, IN THE ANNOTATED ALICE: THE DEFINITIVE EDITION 213 (Martin Gardner ed., Norton Publishers) (2000).

I

CompuCredit marketed a subprime credit card under the brand name Aspire Visa to consumers with low or weak credit scores through massive direct-mail solicitations and the internet.[2] CompuCredit marketed the card and the cards were issued by Columbus Bank and Trust (collectively "Credit Providers").

Greenwood and her fellow plaintiffs ("Consumers") allege CompuCredit marketed the card by representing to consumers it could be used to "rebuild your credit," "rebuild poor credit," and "improve your credit rating." Consumers allege the promotional materials noted there "was no deposit required," and that consumers would immediately receive $300 in available credit when they received the card. In fact, they allege, Credit Providers charged a $29 finance charge, a monthly $6.50 account maintenance fee, and a $150 annual fee, assessed immediately against the $300 limit before the consumer received the card. In aggregate, the card had $257 in fees the first year. Although the promotional material mentioned the fees, it did so in small print amidst other information in the advertisement, and not in proximity to its representations that no deposit was required. Consumers each applied for and received an Aspire card, and were charged these fees. Consumers allege the Credit Providers' actions constitute several violations of the CROA and of California's Unfair Competition Law.

Before receiving the Aspire Visa credit card, each Consumer received a mailing entitled "Pre-Approved Acceptance Certificate." The Acceptance Certificate includes the following paragraph:

---

[2]At this stage in the litigation, the facts as recited here are based on the allegations in Plaintiffs' complaint.

> By signing, I request an Aspire Visa card and ask that an account be opened for me. I certify that everything I have stated in the Acceptance Certificate is true and accurate to the best of my knowledge. I have read and agree to the be bound by the "Summary of Credit Terms" and "Terms of Offer" printed on the enclosed insert, which insert includes a discussion of arbitration applicable to my account, and is incorporated here by reference.

One Consumer mailed in her acceptance, one applied over the internet, and the other applied over the phone.

The "Terms of Offer" states:

> Important — The agreement you receive contains a binding arbitration provision. If a dispute is resolved by binding arbitration, you will not have the right to go to court or have the dispute heard by a jury, to engage in pre-arbitration discovery except as permitted under the code of procedure of the National Arbitration Forum ("NAF"), or to participate as part of a class of claimants relating to such dispute. Other rights available to you in court may be unavailable in arbitration.

The "Summary of Credit Terms" contains the following:

ARBITRATION PROVISION (AGREEMENT TO ARBITRATE CLAIMS)

> Any claim, dispute or controversy (whether in contract, tort, or otherwise) at any time arising from or relating to your Account, any transferred balances or this Agreement (collectively, "Claims"), upon the election of you or us, will be resolved by binding arbitration pursuant to this Arbitration Provision and the Code of Procedure ("NAF Rules") of the

National Arbitration Forum ("NAF") in effect when the Claim is filed. If for any reason the NAF cannot, will not or ceases to serve as arbitration administrator, we will substitute another nationally recognized arbitration organization utilizing a similar code of procedure.

Upon such an election, neither you nor we will have the right to litigate in court the claim being arbitrated, including a jury trial, or to engage in pre-arbitration discovery except as provided under NAF Rules. In addition, you will not have the right to participate as representative or member of any class of claimants relating to any claim subject to arbitration. Except as set forth below, the arbitrator's decision will be final and binding. Other rights available to you in court might not be available in arbitration.

The agreement also provides, "This Agreement, and your Account, and any claim, dispute or controversy (whether in contract, tort or otherwise) . . . are governed by and construed in accordance with applicable federal law and the laws of Georgia."

Consumers brought this action in federal district court, and the Credit Providers moved to compel arbitration of Consumers' CROA claims. The district court held the arbitration clause in the Credit Providers' Aspire Visa credit card agreements was invalid and void under the CROA's prohibition of the waiver of a consumer's right to sue in court, and denied the motion to compel arbitration. The district court also denied the Credit Providers' Motion for Leave to File Motion for Reconsideration. The Credit Providers filed a timely interlocutory appeal challenging the denial of the motion to compel arbitration.

We review the denial of a motion to compel arbitration de novo. *Balen v. Holland Am. Line Inc.*, 583 F.3d 647, 652 (9th

Cir. 2009); *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 725 (9th Cir. 2007) ("Whether [a federal statute] permits adjudication by binding arbitration is a question of law that we review de novo.").

## II

The district court correctly concluded that the arbitration agreement was void because the CROA specifically prohibits provisions disallowing any waiver of a consumer's right to sue in court for CROA violations.

## A

We employ our usual methodology in statutory construction. As always, our starting point is the plain language of the statute. *Children's Hosp. & Health Ctr. v. Belshe*, 188 F.3d 1090, 1096 (9th Cir. 1999). "[W]e examine not only the specific provision at issue, but also the structure of the statute as a whole, including its object and policy." *Id.* If the plain meaning of the statute is unambiguous, that meaning is controlling and we need not examine legislative history as an aid to interpretation unless "the legislative history clearly indicates that Congress meant something other than what it said." *Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 877 (9th Cir. 2001) (en banc). If the statutory language is ambiguous, we consult legislative history. *United States v. Daas*, 198 F.3d 1167, 1174 (9th Cir. 1999).

[1] In this context, we also note that Congress has manifested a "liberal federal policy favoring arbitration agreements." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991) (internal quotation marks omitted). Specifically, the Federal Arbitration Act declares that "[a] written provision in . . . a contract evincing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevoca-

ble, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

**[2]** The Supreme Court has held that "[h]aving made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 624, 628 (1985). "[I]f Congress intended the substantive protection afforded by a given statute to include protection against waiver of the right to a judicial forum, that intention would be deducible from text or legislative history." *Id.* More recently, the Supreme Court has reiterated that the Congressional intent to preclude waiver "will be discoverable in the text of the [statute], its legislative history, or an 'inherent conflict' between arbitration and the [statute's] underlying purposes." *Gilmer*, 500 U.S. at 26. The burden is on the party opposing arbitration to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue. *Id.*

B

With these principles in mind, we turn to the Credit Reporting Organization Act. The CROA expressly identifies four rights, which appear in the disclosures section of the statute, 15 U.S.C. § 1679c. The first two rights concern rights that consumers have in relation to credit bureaus, which are not implicated by this suit. The third and fourth rights specifically concern rights that consumers have in relation to credit repair organizations.[3] The third right directly addresses the Consumers' argument: "You have the right to sue a credit repair organization that violates the Credit Repair Organization Act." 15 U.S.C. § 1679c(a). In addition, each credit repair organization is required to (1) inform the consumer of his or her right to

---

[3]The district court did not rule on whether the Credit Providers are "credit repair organizations" under the meaning of the statute. Therefore, we will not reach this issue on appeal.

sue, (2) provide such information to the consumer in a separate document containing a verbatim copy of an eight-paragraph text specified by Congress, which enumerates the "right to sue," (3) obtain from the consumer a signature confirming receipt of such information, and (4) keep such signed confirmations on file for two years from the date of signing. 15 U.S.C. § 1679c(a)-(c). The disclosure document must be provided to every consumer "before any contract or agreement between the consumer and the credit repair organization is executed." *Id.* § 1679c(a).

The CROA also contains a non-waiver provision, phrased in unusually comprehensive and precise language: "Any waiver by any consumer of any protection provided by or any right of the consumer under this subchapter– (1) shall be treated as void; and (2) may not be enforced by any Federal or State court or any other person." 15 U.S.C. § 1679f(a).

**[3]** Thus, the plain language of the CROA provides consumers with the "right to sue." 15 U.S.C. § 1679c. The "right to sue" means what it says. The statute does not provide a right to "some form of dispute resolution," but instead specifies the "right to sue." The act of suing in a court of law is distinctly different from arbitration. *See Eljer Mfg., Inc. v. Kowin Dev. Corp.*, 14 F.3d 1250, 1254 (7th Cir. 1994) ("Arbitration . . . is a private system of justice" distinct from state and federal courts). The right to sue protected by the CROA cannot be satisfied by replacing it with an opportunity to submit a dispute to arbitration.

Where terms are not defined within a statute, they are accorded their plain and ordinary meaning. *McHugh v. United Serv. Auto. Ass'n*, 164 F.3d 451, 455 (9th Cir. 1999). The plain and ordinary meaning of terms can be deduced through reference sources, including *Black's Law Dictionary* and general usage dictionaries. *See Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009) (determining the plain

meaning of a contract term by referencing *Black's* and *Webster's* Dictionary).

To sue is "[t]o institute a lawsuit against (another party)." BLACK'S LAW DICTIONARY 1473 (Bryan A. Garner ed., 8th ed., 2004). For "lawsuit," Black's directs us to "suit," *id.* at 905, which is defined as: "[a]ny proceeding by a party or parties against another *in a court of law*." *Id.* at 1475 (emphasis added); *see also Weston v. City Council of Charleston*, 27 U.S. (Pet) 449, 464 (1829) (defining "suit" as "any proceeding *in a court of justice*, by which an individual pursues that remedy in a court of justice, which the law affords him") (emphasis added). The plain meaning of the phrase "right to sue" thus clearly involves the right to bring an action in a court of law.

By contrast, "arbitration" is "[a] method of dispute resolution involving one or more neutral third parties who are usu-[ally] agreed to by the disputing parties and whose decision is binding." BLACK'S LAW DICTIONARY 112. Arbitration is one of several mechanisms of "alternative dispute resolution," which is "[a] procedure for settling a dispute *by means other than litigation*, such as arbitration or mediation." *Id.* at 86 (emphasis added). The Corpus Juris Secondum underscores that "[a]rbitration is not a judicial proceeding either at common law or under statutes. It is a proceeding separate from litigation based upon its underlying purpose of encouraging dispute resolution *without result to the courts*, and may be characterized as an alternative to litigation." 6 C.J.S. Arbitration § 2 (June 2005) (emphasis added) (citations omitted); *see also Wolsey, Ltd. v. Foodmaker, Inc.*, 144 F.3d 1205, 1208 (9th Cir. 1998) ("Arbitration is a creature of contract, a device of the parties rather than the judicial process.") (citation omitted); *Becker v. Davis*, 491 F.3d 1292, 1299 (11th Cir. 2007) ("[A]rbitration is a contractual right that is generally predicated on an express decision to waive the right to a trial in a judicial forum."); *Morrison v. Colo. Permanente Med. Group*, 983 F. Supp. 937, 944 (D. Colo. 1997) ("[C]ases and statutes

discuss consistently the terms "arbitration" and "civil action" in a manner that leaves no doubt that arbitration is a creature separate from, and not just a form of, a civil action.").

**[4]** As a matter of parlance, reference, and common sense, we cannot conclude that when Congress used the word "sue," it really meant "arbitrate." The district court correctly read the statute, and determined that the consumer's statutory right to sue could not be waived.

### III

The Credit Providers raise a number of counter-theories, none of which is persuasive.

### A

Credit Providers first argue that, by placing the "right to sue" in the mandatory "Disclosures" section of the statute, thus *requiring* it be explicitly stated to all consumers, does not actually create a right to sue as the terms are ordinarily understood. Under such a reading, Congress, whose purpose in enacting the statute included protecting consumers from misinformation, *see* 15 U.S.C. § 1679(b), drafted a statute which requires credit repair organizations to misinform consumers about a fictional right. Under Defendant's interpretation, Congress was requiring that consumers be told a lie: that they possessed a non-existent right. We should "avoid, if possible, a [statutory] interpretation that would produce 'an absurd and unjust result which Congress could not have intended.' " *United States v. Middleton*, 231 F.3d 1207, 1210 (9th Cir. 2000) (quoting *Clinton v. City of New York*, 524 U.S. 417, 429 (1998)). We do not believe Congress was playing Humpty Dumpty with the statute, and we decline to accept the Credit Providers' invitation to go down that particular rabbit hole.

B

The Credit Providers characterize the language stating "you have the right to sue" in Section 1679c as merely a simplified shorthand for the more "complicated" right to bring a claim under Section 1679g. This is actually a two-step argument. First, Credit Providers argue the "right to sue" language should not be examined independently because it is merely a "simplified" restatement for consumers of the "substantive" rights embodied in the rest of the statute, particularly Section 1679g, which sets out the punishments available for violations of the Act. Second, Credit Providers argue the more general language of Section 1679g does not preclude arbitration.

We disagree. We must, if possible, interpret a statute such that all its language is given effect, and none of it is rendered superfluous. *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001). Under Credit Providers' interpretation, the "right to sue" language, indeed, the entire "Disclosures" section, becomes superfluous and insignificant, merely a restatement of other sections of the statute that expand upon the rights set out in Section 1679c. We decline to adopt such a reading.

In addition, Credit Providers argue the language "right to sue" was used in the Section because it is more "understandable" to the average consumer than a broader phrase such as the "right to bring a claim." This is despite the fact that, according to Credit Providers, Congress meant to give consumers that latter right, rather than the former. If the purpose of the "Disclosures" was to communicate to consumers their right to sue or to proceed using some form of alternative dispute resolution, the phrase "right to sue" is a phrase particularly likely to cause confusion, and lead consumers to misunderstand their rights under the CROA. We see no reason to interpret the language in a way that goes against the purpose even Credit Providers have ascribed to it. The language actually chosen by Congress should be given effect because it is plain and clear on its face, and we "presume that [the]

legislature says in a statute what it means and means in a statute what it says there." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (citing *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).

**[5]** The extremely broad anti-waiver provision in the CROA protects the enumerated "right to sue," by treating as void "[a]ny waiver by any consumer of any protection provided by *or any right of the consumer* under this subchapter . . . ." 15 U.S.C. § 1679f(a) (emphasis added). The Act further provides that "[a]ny attempt by any person to obtain a waiver from any consumer of any protection provided or any right of the consumer under this subchapter shall be treated as a violation of this subchapter." 15 U.S.C. § 1679f(b). The plain language of the statute demonstrates that the waiver provision applies to the previously enumerated "right to sue." First, the use of the word "any" to describe which rights are covered is "expansive language [that] offers no indication whatever that Congress intended" to limit a statute's reach. *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 588-89 (1980). Thus, we read the term "any right of the consumer" to apply to all the rights in the statute, including the "right to sue." Second, Congress's consistent use of the word "right" indicates the waiver prohibition applies to the "right to sue," as identical words in a statute should be given a consistent and identical meaning throughout the statute. *See Powerex Corp v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007). Therefore, we conclude that Congress meant what it said. Accordingly, the non-waiver provision invalidates any waiver of the right to sue.

C

We are also not convinced by Credit Providers' argument regarding the language in 15 U.S.C. § 1679f(a). The section states a consumer waiver of any right or protection "may not be enforced by any Federal or State court or any other person." 15 U.S.C. § 1679f(a). Credit Providers argue the "any other person" language demonstrates Congress intended arbi-

trators to be able to decide CROA claims. First, we do not think this language leads to such a clear and unilateral conclusion. For example, it is foreseeable that a credit repair organization would institute arbitration proceedings against a consumer for collection of the organization's fees under its contract with the consumer. The CROA creates various non-waivable consumer rights and protections other than the right to sue. In an arbitration collection proceeding, one of the other non-waivable consumer rights or protections could arise. The "any other person" language of Section 1679f(a) assures that these rights and protections would be preserved in an arbitration instituted by a credit repair organization or debt collection agency. It is consistent with a consumer's explicitly stated non-waivable right to sue. Given the plain language creating such a right, we do not find this language requires a different conclusion.

In addition, the statutory language underscores the central role of courts in enforcement of the statute in § 1679g. This section, which sets out available damages for violations of the CROA, repeatedly refers only to "courts" as the enforcement mechanism. For example, punitive damages may be assessed in "such additional amount as *the court* may allow" and lays out factors that "*the court* shall consider." 15 U.S.C. § 1679g(a)(2)(A), (b) (emphasis added). Thus, the language in the remainder of the statute supports the plain reading of the text creating the right to sue, rather than requiring a different outcome.

**[6]** We agree with other courts that the "CROA's non-waiver of rights provisions, combined with its proclamation of a consumer's right to sue, represent precisely the expression of congressional intent required by" the Supreme Court to find that a waiver of judicial remedies is precluded. *Alexander v. U.S. Credit Management, Inc.*, 384 F. Supp. 2d 1003, 1011 (N. D. Tex. 2005). "Congress did not intend to void all waivers of rights under the Act, and require consumers to sign a congressionally mandated enumeration of their rights under

the Act, only to permit those very same rights to waived mere moments later upon the signing an agreement such as the one in question here." *Id.* at 1012. We agree with the district court that "[t]o recognize that CROA voids all waivers of 'any *right of the* consumer' and mandates that any waiver of the right to sue is void strikes the court as embracing an *unhealthy* regard for the federal policy favoring arbitration." Dkt. 64, at 8 (citation omitted). Thus, we hold the plain language of the CROA prohibits enforcement of the arbitration agreement.[4]

IV

We realize this decision is in conflict with that of two of our sister circuits, but we are unpersuaded by the reasoning of those cases. *See Gay v. CreditInform*, 511 F.3d 369 (3d Cir. 2007); *Picard v. Credit Solutions, Inc.*, 564 F.3d 1249 (11th Cir. 2009). Both *Gay* and *Picard* give surprisingly little regard to the "right to sue" language in the statute, and rely upon reasoning in Supreme Court cases that are distinguishable from the situation here. As *Picard* essentially follows and adopts the reasoning in *Gay*, we will not deal with the two cases separately.

*Gay* dispatches with the explicit language creating a consumer's "right to sue" in a mere footnote. The court states that since the section does not specify the forum for resolution of the dispute, it does not support the argument that it provides a "judicial, rather than an arbitral, forum for CROA violations." *Gay*, 511 F.3d at 377 n.4. As discussed in more detail above, this ignores the plain meaning of the word "sue." The Third Circuit continues that even if "sue" implies the availability of a judicial forum (which we believe it does), use of the word "would not mean that the organization could not

---

[4]Having found a congressional intent to preclude the waiver of judicial remedies under the CROA in the text of the Act itself, there is no need for us to examine legislative history or any inherent tension between arbitration and the Act's underlying purpose.

assert defenses that it had to such an action including the right to invoke a contractual arbitration provision to change the forum." *Id.* This ignores completely the anti-waiver clause of the statute. The anti-waiver clause explicitly states that any waiver of any right by the consumer "shall be treated as void" and "may not be enforced by any Federal or State court . . . ." 15 U.S.C. § 1679f(a)(1)-(2). Thus, the organization might assert the defense of the contractual arbitration provision, but the court is explicitly forbidden from enforcing this waiver of the right to sue.

*Gay* also relies upon analogies to several Supreme Court arbitration cases that we find unavailing. The Third Circuit first analogized the issue to the one the Supreme Court considered in *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220 (1987), when it determined whether Section 29(a) of the Exchange Act prohibited arbitration agreements. Section 27 of the Act provides, "The district courts of the United States . . . shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder." 15 U.S.C. § 78aa. Section 29(a) of the Act declares void "[a]ny condition, stipulation, or provision binding any person to waive compliance with any provision of [the Act]." *Id.* § 78cc(a). The plaintiffs in *McMahon* argued that Section 29(a) prohibited waiver of the Section 27 right to bring suit in a federal district court.

As pointed out by the court in *McMahon*, the Exchange Act's anti-waiver provision, § 29(a),

> forbids [ ] enforcement of agreements to waive "compliance" with the provisions of the statute. But § 27 itself does not impose any duty with which persons trading in securities must "comply." By its terms, § 29(a) only prohibits waiver of the substantive obligations imposed by the Exchange Act.

> Because § 27 does not impose any statutory duties,
> its waiver does not constitute a waiver of "compli-
> ance with any provision" of the Exchange Act under
> § 29(a).

*McMahon*, 482 U.S. at 228. In summary, because the Exchange Act only prohibits waivers of compliance with its substantive obligations and the mandate of a judicial forum is not a substantive obligation, the Exchange Act does not preclude arbitration agreements.

Applying *McMahon*, the Third Circuit observed that "the section [of the CROA] in which this anti-waiver provision appears is entitled 'Noncompliance with this subchapter.'" *Gay*, 511 F.3d at 385. The Third Circuit reasoned that the CROA's anti-waiver provision only "extend[s] to rights premised on the imposition of statutory duties." *Id.* Because the right to sue in a judicial forum is not a statutory duty under the CROA, the court concluded that the anti-waiver provision did not apply to it. *Id.* However, the plain text of 15 U.S.C. § 1679f encompasses waivers of "any protection" or "any right" under the CROA–categories which are much broader than mere noncompliance. "[H]eadings and titles are not meant to take the place of the detailed provisions of the text," and where the plain text of the statute is unambiguous, "the heading of a section cannot limit the plain meaning of the text." *Bhd. of R.R. Trainmen v. Balt. & Ohio R.R., Co.*, 331 U.S. 519, 528-29 (1947); *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) ("[T]he title of a statute . . . cannot limit the plain meaning of the text. For interpretive purposes, it is of use only when it sheds light on some ambiguous word or phrase."). Here, because the text of § 1679f(a) is not ambiguous, we need not turn to the title of the section to clarify its meaning. Further, the substantive-procedural distinction has no application to the CROA. Unlike the Exchange Act, the CROA grants consumers the "right to sue." Vesting jurisdiction to hear a claim in a particular court is quantitatively different from a statute that expressly provides for a right to sue.

Thus, § 1679f's prohibition on waivers may not be limited to "compliance" with the CROA, and *McMahon* does not apply.[5]

We are also not persuaded that the other Supreme Court cases regarding the availability of arbitration require allowing arbitration in this case. For instance, in *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985), the Supreme Court considered whether the language in 15 U.S.C. § 15(a) rendered antitrust claims non-arbitrable in the context of an international commercial dispute. In relevant part, § 15(a) provides that "any person who shall be injured in his business or property by reason of anything forbidden in antitrust laws may sue therefor in any district court of the United States." The Court held that this section did not evidence a congressional intent to preclude Sherman Act claims from being arbitrable, emphasizing that the Federal Arbitration Act and the Convention on the Recognition of Enforcement of Foreign Arbitral Awards favor arbitration for disputes in international commerce. The Court concluded that it was important "to subordinate domestic notions of arbitrability to the international policy favoring commercial arbitration." *Mitsubishi*, 473 U.S. at 639. The present case differs in that it does not contain an international component. More importantly, the CROA contains express language which precludes waiving "any right of the consumer." 15 U.S.C. § 1679f(a). A

---

[5]The Third Circuit also relies upon the Supreme Court's reasoning in *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 481-83 (1989), which held that the Securities Act of 1933 does not preclude arbitration. *Gay*, 511 U.S. at 385. *Rodriguez de Quijas* considered jurisdictional and non-waiver language virtually identical to the language considered in *McMahon*. The main difference between the two is that the Securities Act allows for concurrent jurisdiction in state and federal courts whereas the Exchange Act provides for exclusive federal jurisdiction. *Rodriguez de Quijas*, 490 U.S. at 481-83. The court relied on the same distinction between procedural and substantive provisions and held that waiving the jurisdictional provision does not fall under the prohibition against waiving "compliance" with the Act. *Id.* We find this reasoning unpersuasive here for the same reasons discussed in regards to *McMahon*.

plain reading of the statute dictates that one of those rights is the "right to sue a credit repair organization that violates" the CROA. *Id.* § 1679c. The Sherman Act does not contain similar non-waiver language, and thus does not apply to this situation.

In *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 29 (1991), the Supreme Court considered whether an arbitration agreement in a securities registration application could be avoided on the theory that arbitration "deprives claimants of the judicial forum provided for by the [Age Discrimination in Employment Act (ADEA)]." The ADEA contains the following non-waiver provision: "any individual may not waive any right or claim under this Act unless the waiver is knowing and voluntary." However, the ADEA does not explicitly provide for a "right to sue." Rather, the ADEA takes a "flexible approach to resolution of claims. The EEOC for example, is directed to pursue 'informal methods of conciliation, conference, and persuasion,' 29 U.S.C. § 626(b), which suggests that an out-of-court dispute resolution, such as arbitration, is consistent with the statutory scheme established by Congress." *Gilmer*, 500 U.S. at 29.

Contrary to the ADEA, the CROA specifically grants access to a judicial forum and a right to sue, and reveals no such "flexibility" toward alternative methods of dispute resolution. Moreover, in contrast to language in the ADEA that permits "knowing and voluntary" waiver of statutory rights, the CROA proscribes any "waiver by any consumer of any protection provided by or any right of the consumer under this title" irrespective of a consumer's knowledge or intent. 15 U.S.C. § 1679f(a). Thus, *Gilmer* is also inapplicable here.

Finally, in *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 80 (2000), the Supreme Court considered whether claims under the Truth in Lending Act (TILA) were arbitrable. The party challenging arbitration did not "contend that the TILA evinces an intention to preclude a waiver of judicial

remedies." *Id.* Instead, plaintiffs challenged arbitration because the costs and fees would be prohibitive. *Id.* The Court, finding no showing regarding prohibitive costs was made, rejected the argument. Here, arbitration is challenged on the ground that the CROA evinces an intention to preclude a waiver of judicial remedies. *Green Tree* simply does not apply.

V

**[7]** The CROA gives consumers the "right to sue," and prevents any waiver of "any right" under the statute. We find this sufficient to demonstrate Congress intended that consumers cannot waive their right to sue under the CROA, and instead submit to arbitration. Therefore, we affirm the district court's holding that the forced arbitration clause is void and the court's denial of the motion to compel arbitration of the CROA claims.

**AFFIRMED.**

TASHIMA, Circuit Judge, dissenting:

Because I disagree with the majority's conclusion that Congress intended to preclude a waiver of a judicial forum for claims under the Credit Repair Organizations Act ("CROA"), I respectfully dissent.

As the majority acknowledges, Congress has manifested "a liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). Under the Federal Arbitration Act, courts should enforce arbitration agreements involving statutory claims " 'unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.' " *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S.

20, 26 (1991) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 628 (1985)). Congress' intent to preclude a waiver of judicial remedies must be shown by the statute's text, its legislative history, or an inherent conflict between arbitration and the statute's underlying purpose. *Id.* Plaintiffs bear the burden of showing that Congress intended to preclude a waiver of a judicial forum for CROA claims. *See Shearson/Am. Express Inc. v. McMahon*, 482 U.S. 220, 227 (1987) ("The burden is on the party opposing arbitration . . . to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue.").

The majority concludes that the plain language of 15 U.S.C. § 1679c(a) provides consumers with the "right to sue," that the right to sue implies a judicial forum, and that 15 U.S.C. § 1679f prohibits any waiver of this right. (Maj. Op. at 12080.) I submit, however, that the plain language of § 1679c(a) does not confer this right upon consumers, and neither the CROA nor its legislative history shows that Congress intended to preclude a waiver of judicial remedies.

All that § 1679c(a) requires is that a credit repair organization provide consumers with the following written disclosure:

> You have a right to dispute inaccurate information in your credit report . . . .

> You have a right to obtain a copy of your credit report . . . .

> You have a right to sue a credit repair organization that violates the Credit Repair Organization Act. This law prohibits deceptive practices by credit repair organizations.

> You have the right to cancel your contract with any credit repair organization for any reason within 3 business days from the date you signed it.

. . . .

15 U.S.C. § 1679c(a). This section does not purport to create any substantive rights, including the right to sue. Rather, its sole purpose is to set forth a disclosure statement to be communicated verbatim to consumers.

Each of the rights referred to in § 1679c(a) is separately conferred within Chapter 41 of Title 15, thus indicating that Congress included § 1679c(a) to advise consumers of relevant rights provided for *elsewhere* in the CROA. *See Rex v. CSA-Credit Solutions of America, Inc.*, 507 F. Supp. 2d 788, 798-99 (W.D. Mich. 2007) ("The inclusion of separate sections actually providing the substantive rights indicates that the language in the disclosures in § 1679c does not create any rights. Rather, the language in § 1679c only sets forth the phrasing that is to be used in advising consumers of their rights under other sections of Chapter 41 of Title 15."). For example, 15 U.S.C. § 1681i provides a consumer with the right to dispute inaccurate information in his credit report, 15 U.S.C. § 1681j provides a consumer with the right to obtain a copy of his credit report, and 15 U.S.C. § 1679e(a) provides a consumer with the right to cancel a contract with a credit repair organization within three business days. *See Rex*, 507 F. Supp. at 799 n.5.

The "right to sue" listed in § 1679c(a) is provided for in 15 U.S.C. § 1679g, which establishes civil liability for violations of the CROA. Because § 1679g provides for civil liability, a consumer ordinarily has the "right to sue" a credit repair organization which violates the CROA. Nowhere in the CROA, however, does Congress mandate a judicial forum for enforcement of the CROA's substantive provisions. The disclosure language in § 1679c(a), while recognizing a right to sue, does not itself confer that right. *See Gay v. CreditInform*, 511 F.3d 369, 381-82 (3d Cir. 2007) ("Although the statutes clearly contemplate consumers' actions being brought in a judicial forum . . . and to that extent may be said to recognize

a consumer's right to proceed in court, they neither contain provisions creating such rights nor indicate that Congress . . . intended to exclude claims asserted under the CROA . . . from arbitration agreements."). Because § 1679c(a) does not establish any rights, but only requires credit repair organizations to make a written disclosure to consumers, the disclosure statement's mention of a "right to sue" cannot be the basis of a non-waivable right under 15 U.S.C. § 1679f.

In addition, 15 U.S.C. § 1679f indicates that Congress intended that CROA claims to be enforceable outside a judicial forum. It provides that "[a]ny waiver . . . of any protection . . . or any right . . . under this subchapter . . . may not be enforced by any Federal or State court *or any other person*." 15 U.S.C. § 1679f(a) (emphasis added). By including "or any other person" in the same sentence that lists Federal and State courts as appropriate fora for CROA claims, Congress clearly indicated that arbitrators, mediators, and other third parties may decide CROA claims. This language indicates that Congress contemplated a role for arbitrators in enforcing CROA claims. On the other hand, the majority's suggestion that the references to "the court" in § 1679g support a right to sue in court, does not overcome the "liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24. Such language merely indicates Congress' expectation that the question of civil liability will normally be resolved in a judicial forum. It does not confer a non-waivable right to a judicial forum.

Finally, the mere mention of a "right to sue" does not necessarily mean the right to sue *in court*, especially given the lack of other statutory language supporting this interpretation. The only other circuits to have ruled on this issue are in agreement. *See Picard v. Credit Solutions, Inc.*, 564 F.3d 1249, 1255 (11th Cir. 2009) ("Although CROA requires credit repair organizations to inform consumers of their right to a private cause of action, such does not preclude arbitration under CROA"); *Gay*, 511 F.3d at 377 n.4 ("[15 U.S.C.

§ 1679c(a)] does not specify the forum for the resolution of the dispute and therefore does not support [the] argument that the CROA provides a consumer with the right to bring suit in a judicial, rather than an arbitral, forum for CROA violations."). We should not lightly create a circuit split on an issue of national application on the basis of the flimsy evidence on which the majority relies. *See Maniar v. Fed. Deposit Ins. Corp.*, 979 F.2d 782, 785 (9th Cir. 1992) ("[U]niformity among the circuits in matters having general application to the various states is preferable as long as individual justice is not sacrificed."). We should be "hesitant to create such a split, and we should do so only after the most painstaking inquiry" and only if required by the "unambiguously expressed intent of Congress." *Zimmerman v. Dep't of Justice*, 170 F.3d 1169, 1183-84 (9th Cir. 1999).

The majority does not even address whether the legislative history of the CROA or any inherent conflict between arbitration and the statute's underlying purpose may form a basis for prohibiting waiver of the judicial forum. Nothing cited by Plaintiffs suggests that Congress actually considered the issue of arbitrability of CROA claims, and the legislative history does not establish that Congress intended CROA claims to be non-arbitrable. *See Rex*, 507 F. Supp. 2d at 800 ("In the absence of any discussion of arbitration in the legislative history, the legislative history cannot provide a basis for the Court to conclude that Congress intended claims under the CROA to be nonarbitrable."). In addition, there is no inherent conflict between arbitration and CROA's underlying purpose because Plaintiffs may enforce their rights under the substantive provisions of CROA even if compelled to arbitrate. *See Mitsubishi Motors Corp.*, 473 U.S. at 628 ("By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.").

Because neither the plain text of the statute, its legislative history, nor any inherent conflict between the purpose of

CROA and arbitration shows that Congress intended to preclude a waiver of judicial remedies, I would reverse the district court's order and remand with instructions to compel arbitration.