Justice Scalia
delivered the opinion of the Court.
We consider whether the Credit Repair Organizations Act (CROA or Act), 15 U. S. C. § 1679 et seq., precludes enforce­ment of an arbitration agreement in a lawsuit alleging viola­tions of that Act.
I
Respondents are individuals who applied for and received an Aspire Visa credit card marketed by petitioner Compu-­ *97 Credit Corporation and issued by Columbus Bank and Trust, now a division of petitioner Synovus Bank. In their applica­tions they agreed to be bound by a provision which read: “Any claim, dispute or controversy (whether in contract, tort, or otherwise) at any time arising from or relating to your Account, any transferred balances or this Agreement (collectively, ‘Claims’), upon the election of you or us, will be resolved by binding arbitration . . .App. 62.
In 2008, respondents filed a class-action complaint against CompuCredit and Columbus in the United States District Court for the Northern District of California, alleging, as relevant here, violations of the CROA. The claims largely involved the defendants’ allegedly misleading representa­tion that the credit card could be used to rebuild poor credit and their assessment of multiple fees upon opening of the accounts, which greatly reduced the advertised credit limit.
The District Court denied the defendants’ motion to com­pel arbitration of the claims, concluding that “Congress in­tended claims under the CROA to be non-arbitrable.” 617 F. Supp. 2d 980, 988 (2009). A panel of the United States Court of Appeals for the Ninth Circuit affirmed, Judge Tash-­ima dissenting. 615 F. 3d 1204 (2010). We granted certio-­rari, 563 U. S. 973 (2011).
II
The background law governing the issue before us is the Federal Arbitration Act (FAA), 9 U. S. C. § 1 et seq., enacted in 1925 as a response to judicial hostility to arbitration. AT&T Mobility LLC v. Concepcion, 563 U. S. 333, 339 (2011). As relevant here, the FAA provides:
“A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevo­cable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.” 9 U.S. C. §2.
*98 This provision establishes “a liberal federal policy favoring arbitration agreements.” Moses H. Cone Memorial Hospi­tal v. Mercury Constr. Corp., 460 U. S. 1,24 (1983). See also, e. g., Concepcion, supra, at 339; Gilmer v. Interstate/Johnson Lane Corp., 500 U. S. 20, 25 (1991). It requires courts to enforce agreements to arbitrate according to their terms. See Dean Witter Reynolds Inc. v. Byrd, 470 U. S. 213, 221 (1985). That is the case even when the claims at issue are federal statutory claims, unless the PAA’s mandate has been “overridden by a contrary congressional command.” Shear son/American Express Inc. v. McMahon, 482 U. S. 220, 226 (1987). See also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U. S. 614, 628 (1985). Re­spondents contend that the CROA contains such a command.
That statute regulates the practices of credit repair orga­nizations, defined as certain entities that offer services for the purpose of “(i) improving any consumer's credit record, credit history, or credit rating; or (ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i).”[1] 15 U. S. C. § 1679a(3). In its principal substantive provisions, the CROA prohibits cer­tain practices, § 1679b, establishes certain requirements for contracts with consumers, §1679d, and gives consumers a right to cancel, §1679e. Enforcement is achieved through the Act’s provision of a private cause of action for violation, § 1679g, as well as through federal and state administrative enforcement, §1679h.
Ill
Like the District Court and the Ninth Circuit, respondents focus on the CROA’s disclosure and nonwaiver provisions. The former, which is reproduced in full in the Appendix, infra, sets forth a statement that the credit repair organiza­ *99 tion must provide to the consumer before any contract is executed. § 1679c(a). One sentence of that required state­ment reads, “ ‘You have a right to sue a credit repair organi­zation that violates the Credit Repair Organization Act.'”’ The Act’s nonwaiver provision states, “Any waiver by any consumer of any protection provided by or any right of the consumer under this subchapter — (1) shall be treated as void; and (2) may not be enforced by any Federal or State court or any other person.” § 1679f(a).
The Ninth Circuit adopted the following line of reasoning, urged upon us by respondents here: The disclosure provision gives consumers the “right to sue,” which “clearly involves the right to bring an action in a court of law.” 615 F. 3d, at 1208. Because the nonwaiver provision prohibits the waiver of “any right of the consumer under this subchapter,” the arbitration agreement — which waived the right to bring an action in a court of law — cannot be enforced. Id., at 1214.
The flaw in this argument is its premise: that the disclo­sure provision provides consumers with a right to bring an action in a court of law. It does not. Rather, it imposes an obligation on credit repair organizations to supply consumers with a specific statement set forth (in quotation marks) in the statute. The only consumer right it creates is the right to receive the statement, which is meant to describe the con­sumer protections that the law elsewhere provides. The statement informs consumers, for instance, that they can dis­pute the accuracy of information in their credit file and that “ ‘[t]he credit bureau must then reinvestigate and modify or remove inaccurate or incomplete information.’ ” 15 U. S. C. § 1679c(a). That description is derived from § 1681i(a), which sets out in great detail the procedures to be followed by a credit bureau in the event of challenges to the accuracy of its information. Similarly, the required statement in­forms consumers that they may “ ‘cancel your contract with any credit repair organization for any reason within 3 busi­ness days from the date you signed it’” — the right created *100 and set forth in more detail in § 1679e. And the “right to sue” language describes the consumer’s right to enforce the credit repair organization’s “liability]” for “failfure] to com­ply with any provision of this subchapter” provided for in § 1679g(a).[2] Thus, contrary to the dissent’s assertion, our in­terpretation does not “[r]educ[e] the required disclosure to insignificance,” post, at 115. The disclosure provision in­forms consumers of their right to enforce liability for any failure to conform to the statute — information they might otherwise not possess. It is the dissent’s interpretation that effectively reduces a portion of the CROA to a nullity. In­terpreting the “right to sue” language in § 1679c(a) to “cre­ate” a right to sue in court not only renders it strikingly out of place in a section that is otherwise devoted to giving the consumer notice of rights created elsewhere; it also renders the creation of the “right to sue’’ elsewhere superfluous.
Respondents suggest that the CROA’s civil-liability provi­sion, § 1679g (set forth in full in the Appendix, infra), demon­strates that the Act provides consumers with a “right” to bring an action in court. They cite the provision’s repeated use of the terms “action,” “class action,” and “court” — terms that they say call to mind a judicial proceeding. These ref­erences cannot do the heavy lifting that respondents assign them. It is utterly commonplace for statutes that create civil causes of action to describe the details of those causes of action, including the relief available, in the context of a court suit. If the mere formulation of the cause of action in this standard fashion were sufficient to establish the “con­ *101 trary congressional command” overriding the FAA, McMa­hon, 482 U. S., at 226, valid arbitration agreements covering federal causes of action would be rare indeed. But that is not the law. In Gilmer we enforced an arbitration agree­ment with respect to a cause of action created by the Age Discrimination in Employment Act of 1967 (ADEA) which read, in part: “Any person aggrieved may bring a civil action in any court of competent jurisdiction for such legal or equi­table relief as will effectuate the purposes of this chapter.” 29 U. S. C. § 626(c)(1). In McMahon we enforced an arbitra­tion agreement with respect to a cause of action created by a provision of the Racketeer Influenced and Corrupt Organi­zations Act which read, in part: “Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit . . . .” 18 U. S. C. § 1964(c). And in Mitsubishi Motors we enforced an arbi­tration agreement with respect to a cause of action created by a provision of the Clayton Act which read, in part: “[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney’s fee.” 15 U. S. C. § 15(a). Thus, we have repeatedly recognized that contractually required arbitration of claims satisfies the stat­utory prescription of civil liability in court. See Gilmer, 500 U. S., at 28; McMahon, supra, at 240; Mitsubishi Mo­tors, 473 U. S., at 637. To be sure, none of the statutes described above contained a nonwaiver provision, as the statute before us does. But if a cause-of-action provision mentioning judicial enforcement does not create a right to initial judicial enforcement, the waiver of initial judicial en­forcement is not the waiver of a “right of the consumer,” § 1679f(a). It takes a considerable stretch to regard the non-­ *102 waiver provision as a “congressional command” that the FAA shall not apply.[3]
Moreover, if one believes that § 1679g’s contemplation of court suit (combined with §1679f(a)) establishes a non-­waivable right to initial judicial enforcement, one must also believe that it establishes a nonwaivable right to initial judi­cial enforcement in any competent judicial tribunal, since it contains no limitation. We think it clear, however, that this mere “contemplation” of suit in any competent court does not guarantee suit in all competent courts, disabling the parties from adopting a reasonable forum-selection clause. And just as the contemplated availability of all judicial forums may be reduced to a single forum by contractual specifica­tion, so also can the contemplated availability of judicial ac­tion be limited to judicial action compelling or reviewing ini­tial arbitral adjudication. The parties remain free to specify such matters, so long as the guarantee of § 1679g — the guar­antee of the legal power to impose liability — is preserved.
Respondents and the dissent maintain that if the CROA does not create a right to a judicial forum, then the disclosure provision effectively requires that credit repair organizations mislead consumers. We think not. The disclosure provi­sion is meant to describe the law to consumers in a manner that is concise and comprehensible to the layman — which necessarily means that it will be imprecise. The required statement says, for example, that the CROA “ ‘prohibits de­ceptive practices by credit repair organizations,’ ” 15 U. S. C. § 1679c(a). This is in some respects an overstatement, and in some respects an understatement, of the “Prohibited prac­tices” set forth in § 1679b. It would include, for example, *103 deception apart from “the offer or sale of the services of the credit repair organization,” § 1679b(a)(4). Yet we would not hold, in order to prevent the required statement from being “misleading,” that a consumer has a right to be protected from deceptive practices beyond those actually covered by § 1679b. So also with respect to the statement’s description of a “right to sue.” This is a colloquial method of communi­cating to consumers that they have the legal right, enforce­able in court, to recover damages from credit repair organi­zations that violate the CROA. We think most consumers would understand it this way, without regard to whether the suit in court has to be preceded by an arbitration proceeding. Leaving that possibility out may be imprecise, but it is not misleading — and certainly not so misleading as to demand, in order to avoid that result, reading the statute to contain a guaranteed right it does not in fact contain.
IV
At the time of the CROA’s enactment m 1996, arbitration clauses in contracts of the type at issue here were no rarity. Quite the contrary, the early 1990⅛ saw the increased use of arbitration clauses in consumer contracts generally, and in financial services contracts in particular. See' Ware, Arbi­tration and Unconscionability After Doctor’s Associates, Inc. v. Casarotto, 31 Wake Forest L. Rev. 1001, 1001, and n. 3 (1996); J. Shimabukuro, Congressional Research Service Report for Congress, The Federal Arbitration Act: Back­ground and Recent Developments 1 (2002).
Had Congress meant to prohibit these very common provi­sions in the CROA, it would have done so in a manner less obtuse than what respondents suggest. When it has re­stricted the use of arbitration in other contexts, it has done so with a clarity that far exceeds the claimed indications in the CROA. See, e.g., 7 U.S.C. §26(n)(2) (2006 ed., Supp. IV) (“No predispute arbitration agreement shall be valid or enforceable, if the agreement requires arbitration of *104 a dispute arising under this section”); 15 U. S. C. § 1226(a)(2) (2006 ed.) (“Notwithstanding any other provision of law, whenever a motor vehicle franchise contract provides for the use of arbitration to resolve a controversy arising out of or relating to such contract, arbitration may be used to settle such controversy only if after such controversy arises all par­ties to such controversy consent in writing to use arbitration to settle such controversy”); cf. 12 U. S. C. § 5518(b) (2006 ed., Supp. IV) (granting authority to the newly created Con­sumer Financial Protection Bureau to regulate predispute arbitration agreements in contracts for consumer financial products or services).[4] That Congress would have sought to achieve the same result in the CROA through combination of the nonwaiver provision with the “right to sue” phrase in the disclosure provision, and the references to “action” and “court” in the description of damages recoverable, is unlikely.
⅜ ⅝ ⅜
Because the CROA is silent on whether claims under the Act can proceed in an arbitral forum, the FAA requires the arbitration agreement to be enforced according to its terms. The judgment of the Ninth Circuit is reversed, and the case *105 is remanded for further proceedings consistent with this opinion.

It is so ordered.

APPENDIX
Title 15 U. S. C. § 1679c provides:
“(a) Disclosure required
“Any credit repair organization shall provide any con­sumer with the following written statement before any con­tract or agreement between the consumer and the credit repair organization is executed:
“ ‘Consumer Credit File Rights Under State and Federal Law
“‘You have a right to dispute inaccurate information in your credit report by contacting the credit bureau directly. However, neither you nor any “credit repair” company or credit repair organization has the right to have accurate, cur­rent, and verifiable information removed from your credit report. The credit bureau must remove accurate, negative information from your report only if it is over 7 years old. Bankruptcy information can be reported for 10 years.
“ ‘You have a right to obtain a copy of your credit report from a credit bureau. You may be charged a reasonable fee. There is no fee, however, if you have been turned down for credit, employment, insurance, or a rental dwelling because of information in your credit report within the preceding 60 days. The credit bureau must provide someone to help you interpret the information in your credit file. You are enti­tled to receive a free copy of your credit report if you are unemployed and intend to apply for employment in the next 60 days, if you are a recipient of public welfare assistance, or if you have reason to believe that there is inaccurate infor­mation in your credit report due to fraud.
“ ‘You have a right to sue a credit repair organization that violates the Credit Repair Organization Act. This law pro­hibits deceptive practices by credit repair organizations.
*106 “‘You have the right to cancel your contract with any credit repair organization for any reason within 3 business days from the date you signed it.
“ ‘Credit bureaus are required to follow reasonable proce­dures to ensure that the information they report is accurate. However, mistakes may occur.
“ ‘You may, on your own, notify a credit bureau in writing that you dispute the accuracy of information in your credit file. The credit bureau must then reinvestigate and modify or remove inaccurate or incomplete information. The credit bureau may not charge any fee for this service. Any perti­nent information and copies of all documents you have con­cerning an error should be given to the credit bureau.
“‘If the credit bureau’s reinvestigation does not resolve the dispute to your satisfaction, you may send a brief state­ment to the credit bureau, to be kept in your file, explaining why you think the record is inaccurate. The credit bureau must include a summary of your statement about disputed information with any report it issues about you.
“ ‘The Federal Trade Commission regulates credit bureaus and credit repair organizations. For more information contact:
“ ‘The Public Reference Branch
“ ‘Federal Trade Commission
“ ‘Washington, D. C. 20580’.
“(b) Separate statement requirement
“The written statement required under this section shall be provided as a document which is separate from any writ­ten contract or other agreement between the credit repair organization and the consumer or any other written material provided to the consumer.
“(c) Retention of compliance records
“(1) In general
“The credit repair organization shall maintain a copy of the statement signed by the consumer acknowledging receipt of the statement.
*107 “(2) Maintenance for 2 years
“The copy of any consumer’s statement shall be main­tained in the organization’s files for 2 years after the' date on which the statement is signed by the consumer.”
* * *
Section 1679g provides:
“(a) Liability established
“Any person who fails to comply with any provision of this subchapter with respect to any other person shall be liable to such person in an amount equal to the sum of the amounts determined under each of the following paragraphs:
“(1) Actual damages
“The greater of—
“(A) the amount of any actual damage sustained by such person as a result of such failure; or
“(B) any amount paid by the person to the credit re­pair organization.
“(2) Punitive damages
“(A) Individual actions
“In the case of any action by an individual, such ad­ditional amount as the court may allow.
“(B) Class actions
“In the case of a class action, the sum of—
“(i) the aggregate of the amount which the court may allow for each named plaintiff; and
“(ii) the aggregate of the amount which the court may allow for each other class member, without re­gard to any minimum individual recovery.
“(3) Attorneys’ fees
“In the case of any successful action to enforce any lia­bility under paragraph (1) or (2), the costs of the action, together with reasonable attorneys’ fees.
*108 “(b) Factors to be considered in awarding punitive damages
“In determining the amount of any liability of any credit repair organization under subsection (a)(2) of this section, the court shall consider, among other relevant factors—
“(1) the frequency and persistence of noncompliance by the credit repair organization;
“(2) the nature of the noncompliance;
“(3) the extent to which such noncompliance was inten­tional; and
“(4) in the case of any class action, the number of con­sumers adversely affected.”

 The District Court said that petitioners do not dispute that they come within this definition. See 617 F. Supp. 2d 980, 984, n. 2 (ND Cal. 2009). The Ninth Circuit did not address that issue, see 615 F. 3d 1204,1207, n. 3 (2010), nor do we.

 Accordingly, when a consumer sues to enforce liability under the CROA, he does so under § 1679g(a), not “in light of § 1679c,” post, at 113 (Ginsburg, J., dissenting). An action under the CROA need not refer to § 1679c at all, unless it is based on the company’s failure to provide the statement required under that section. Section 1679g(a) creates the “right” at issue and describes it in detail not contained in § 1679e’s summary. When determining the scope of that right, it is therefore § 1679g(a) — and not § 1679c — that must govern.

 Gilmer noted that the ADEA had been amended after conclusion of the arbitration agreement in that case to preclude waiver of “rights or claims that may arise after the date the waiver is executed.” 29 U. S. C. § 626(f)(1)(C). The Court said in dictum that this provision “did not ex­plicitly preclude arbitration or other nonjudicial resolution of claims,” 500 U. S., at 29.

 The dissent questions the relevance of these statutes, since they post­dated the CROA and since this Court’s intervening decisions compelling arbitration “increasingly alerted Congress to the utility of drafting anti-­waiver prescriptions with meticulous care.” Post, at 116. But as the dis­sent implicitly recognizes, Congress had been “alerted” much before these post-CROA statutes were passed. The CROA itself followed a series of this Court’s seminal decisions compelling arbitration, decisions which held that the FAA had established a ‘“federal policy favoring arbitration,’” Gilmer v. Interstate/Johnson Lane Corp., 500 U. S. 20, 26 (1991), and that “[t]he burden is on the party opposing arbitration ... to show that Con­gress intended to preclude a waiver of judicial remedies,” Shear son/Amer­ican Express Inc. v. McMahon, 482 U. S. 220, 227 (1987). To the extent Congress is ever “stimulated” by this Court’s decisions, post, at 116, there is no reason to think the Congress that enacted the CROA was any less stimulated than subsequent Congresses.