**Bonnie ADAMS, et al., Plaintiffs,**

v.

**AT & T MOBILITY, LLC, Defendant.**

**Case No. C10–763RAJ.**

United States District Court,
W.D. Washington,
at Seattle.

Sept. 20, 2011.

Clifford A. Cantor, Sammamish, WA, for Plaintiffs.

Archis A. Parasharami, Mayer Brown LLP, Washington, DC, David A. Bateman, K & L Gates LLP, Seattle, WA, for Defendant.

ORDER

RICHARD A. JONES, District Judge.

## I. INTRODUCTION

This matter comes before the court on motions to compel arbitration pending in this case and in *Stoican v. Cellco P'ship,* No. C10–1017RAJ. In each case, the Defendant is a wireless phone service provider invoking § 4 of the Federal Arbitration Act ("FAA") (9 U.S.C. § 4) to force arbitration of a claim from a consumer who prefers to litigate the dispute in court. AT & T Mobility, LLC ("ATTM") is the Defendant in this case, and Cellco Partnership, doing business as Verizon Wireless ("Verizon"), is the Defendant in the *Stoican* case. The only party to request oral argument on either motion was ATTM. The court finds both motions suitable for disposition without oral argument. For the reasons stated below, the court GRANTS ATTM's motion to compel arbitration (Dkt. # 37) as well as Verizon's motion. The court DENIES ATTM's motion to seal (Dkt. # 60) and GRANTS its motion for leave to file an additional brief (Dkt. # 67). Because no party has requested a stay pending arbitration, the court directs the clerk to DISMISS both actions without prejudice to Plaintiffs raising their claims in arbitration. The clerk shall enter judgments for Verizon and ATTM. The court will issue a separate order in the *Stoican* case memorializing its decision.

## II. BACKGROUND

### A. Plaintiffs and Their Claims

Ms. Stoican is a Washington resident and a longtime Verizon customer. She does not dispute that she is a party to Verizon's wireless service agreement. She claims that she declined an offer from Verizon in 2009 for a free trial of its "Navigator" data service. Nonetheless, beginning in May 2009, Verizon charged her $9.99 each month for the service. It continued to do so for nine months despite Ms. Stoican's efforts to cancel the service and obtain a refund. Ms. Stoican asserts that Verizon's conduct violated the Communications Act of 1934 ("FCA"), specifically its prohibition on unjust and unreasonable charges and practices. 47 U.S.C. § 201(b). She also claims that Verizon breached its wireless service agreement and violated the Washington Consumer Protection Act ("CPA"). She hopes to

represent a class of all Washington customers whom Verizon charged for Navigator service without their consent.

Unlike Ms. Stoican, Plaintiffs Bonnie Adams, Melissa Meece, and Alexandra Severance (collectively the "Adams Plaintiffs") did not enter a service agreement with the cellular phone company they are now suing. Each of them is a resident of Vermont, and each of them entered a service agreement with Unicel, Inc. ("Unicel"). Verizon (by coincidence) sought to purchase Unicel, a transaction that drew scrutiny from federal antitrust regulators. To win federal approval for the transaction, Verizon agreed to divest itself of Unicel customers in certain regions, including virtually all of Vermont. Verizon arranged to sell its Vermont service agreements to ATTM in December 2008. ATTM itself did not acquire the service agreements, it instead used its subsidiary New Cingular Wireless PCS, LLC ("New Cingular") to make the acquisition.[1] No one disputes that New Cingular acquired the Adams Plaintiffs' Unicel agreements in December 2008. Carroll Decl. (Dkt. # 38) ¶ 3; McGee Decl. (Dkt. # 39) ¶ 4. No one disputes that at all relevant times, New Cingular was an ATTM subsidiary that held the Adams Plaintiffs' Unicel agreements. McGee Decl. ¶ 5.

ATTM hoped to convince the Unicel customers whose service agreements it had acquired to enter new agreements with ATTM. To that end, it sent text messages in 2009 to Unicel customers, including the Adams Plaintiffs. The text messages touted ATTM's services. Each Plaintiff contacted either ATTM or Unicel to request that they receive no more messages, but they received additional messages nonetheless.

The Adams Plaintiffs sued, contending that ATTM's unsolicited text messages violated the FCA's ban on certain automated messages. 47 U.S.C. § 227(b).[2] They seek to pursue not only their own claims, but the claims of a nationwide class of Unicel customers who received similar unsolicited text messages from ATTM.

## B. Terms of Plaintiffs' Wireless Service Agreements

Each of the Plaintiffs entered a wireless service agreement that contains an arbitration clause that includes a prohibition on class arbitration. Ms. Stoican's Verizon service agreement includes a clause entitled "Dispute Resolution and Mandatory Arbitration." Verizon Agr. (Diaz Decl. (Dkt. # 6), Ex. B) at original pp. 12–13 (cited hereinafter as Verizon Arb. Cl.).[3] In

---

**1.** ATTM has moved to seal a single exhibit to the declaration of an ATTM paralegal. Wilder Decl. (Dkt. # 59), Ex. 1. The exhibit is a 2008 contract evidencing an asset transfer from a Verizon subsidiary to an ATTM subsidiary. Dkt. # 62. Although ATTM's counsel has declared that the contract is subject to a confidentiality agreement, he does not provide that agreement for the court's review, reveal who the confidentiality agreement binds, or explain why it is still necessary to enforce the confidentiality agreement three years later. Bateman Decl. (Dkt. # 61). ATTM has accordingly not met its obligation to establish, at a minimum, good cause to file a document under seal. Local Rules W.D. Wash. CR 5(g)(2).

**2.** The statute on which the Adams Plaintiffs rely initially became part of the FCA via the Telephone Consumer Protection Act of 1991. Congress has amended it several times since.

**3.** The wireless service agreements at issue have evolved over time. Except as noted, no one disputes that the versions included in the record are materially identical to the ones that Plaintiffs entered. Because the agreements often contain no useful numbering or other means of citation, the court endeavors to be explicit about which portions it cites. Moreover, the court generally will not reproduce the capitalization and other formatting in the agreements.

relevant part, it mandates arbitration for disputes arising out of the service agreement or arising out of products or services furnished in accordance with the agreement. Verizon Arb. Cl., preamble & ¶ 1. The only claims exempt from the arbitration clause are "qualifying small claims court cases." *Id.* ¶ 1. For claims over $10,000, the clause specifies the use of the Wireless Industry Arbitration ("WIA") Rules developed by the American Arbitration Association ("AAA"). *Id.* ¶ 2. For smaller claims, the clause specifies the use of AAA consumer arbitration rules or the arbitration rules of the Better Business Bureau ("BBB"). *Id.* ¶ 2. Critically, the clause "doesn't permit class arbitrations even if [the applicable arbitration rules] would." *Id.* ¶ 3. Verizon agrees to pay for the consumer's arbitration filing fees, administrative fees, arbitration appeal fees, and the cost of the arbitrator, so long as the consumer first participates in at least one telephonic session of a non-binding mediation program that Verizon provides. *Id.* ¶¶ 3–4. Verizon employees may serve as mediators in the program. *Id.* ¶ 3. In the event, however, that an arbitrator finds the consumer's claim to be "frivolous or brought for improper purposes" within the meaning of Federal Rule of Civil Procedure 11, Verizon reserves the right to seek payment of arbitration fees and costs in accordance with the applicable arbitration rules. *Id.* ¶ 4. If the consumer recovers more than any Verizon pre-arbitration offer (or recovers any amount in the event that Verizon makes no offer), Verizon agrees to pay not only the consumer's attorney fees, but an award of $5000 if the arbitration award is less than $5000. *Id.* ¶ 5. The Verizon arbitration clause specifies that an arbitrator "can award the same damages and relief, and must honor the same limitations in this agreement, as a court would." *Id.* (preamble). In a separate clause entitled "Waivers and Limitations of Liability," the agreement declares that "unless the law forbids it in any particular case," neither Verizon nor the consumer may claim "indirect, special, consequential, treble, or punitive damages."

The Unicel Agreement that the Adams Plaintiffs entered contains an arbitration clause that is less friendly to consumers than Verizon's. Unicel Agr. (Sargent Decl. (Dkt. # 40), Ex. 1) ¶ 2 (cited hereinafter as Unicel Arb. Cl.). It permits either Unicel or the consumer to force the arbitration of any claim. *Id.* ¶ 2(a). WIA Rules apply. *Id.* ¶ 2(b). Unicel agrees to "pay the initial filing fee and the costs of the arbitration proceeding," except that it requires a consumer who initiates arbitration to pay the first $75 of the initial filing fee. *Id.* ¶ 2(d). Each party is responsible for its own "attorney, witness, and expert fees and costs." *Id.* A consumer has no "right to have any claim arbitrated as a class action under the [applicable] Rules or under any other rules of civil procedure." *Id.* ¶ 2(e). Like the Verizon agreement, the Unicel agreement contains a clause separate from the arbitration clause that excludes "punitive, indirect, special or consequential damages," but that waiver applies only "to the furthest extent allowed by the law." *Id.* ¶ 15. The Unicel agreement also includes a waiver of "any claim for equitable relief," but only "to the fullest extent allowed by the law." *Id.*

ATTM has offered the Adams Plaintiffs the opportunity to avoid the relatively unfriendly terms of the Unicel agreement and arbitrate their claims in accordance with the arbitration agreement in ATTM's arbitration clause.[4] ATTM agrees to pay

---

4. ATTM's wireless service agreement is not part of the record. The court relies instead on the summary of arbitration rights that ATTM offers on its website. Weiman Decl. (Dkt. # 41), Ex. 5. No one disputes that the summary accurately describes the ATTM arbitration clause.

all of a consumer's arbitration costs for any claim under $75,000. Only in the event that an arbitrator finds the consumer filed a claim for an improper purpose or filed a frivolous claim (with the meaning of Rule 11) can ATTM seek reimbursement of its arbitration costs. If a consumer wins an arbitration award larger than ATTM's last settlement offer, ATTM will pay the consumer the larger of $10,000 or the amount of the award. In that event, ATTM will also pay double the consumer's attorney fees, and reimburse any expenses, including expert witness fees and costs. Like the Unicel and Verizon arbitration clauses, however, the ATTM clause prohibits class arbitration. Unlike Unicel and Verizon, ATTM does not attempt to limit the types of damages a consumer can recover in arbitration.

## C. Consumer Arbitration Agreements and the Federal Arbitration Act

As the court will now discuss, a substantially similar version of the ATTM arbitration agreement features prominently in new legal authority that bears on the arbitrability of these Plaintiffs' disputes. Last year, Verizon and ATTM filed motions to compel arbitration of the disputes Ms. Stoican and the Adams Plaintiffs raised. At the time it filed its motion, Verizon conceded that Washington law and Ninth Circuit precedent spelled doom for its motion to compel arbitration. In *Scott v. Cingular Wireless*, 160 Wash.2d 843, 161 P.3d 1000 (2007), the Washington Supreme Court held that the arbitration clause in the wireless service agreement before it was unenforceable because it was unconscionable under Washington law. Like the agreements at issue here, the agreement in *Scott* prohibited class arbitration. The

*Scott* court explained that the bar on all classwide proceedings effectively exculpated the wireless provider from liability, because consumers would virtually never pursue individual arbitration of small claims like the ones likely to arise from their wireless service agreements. 161 P.3d at 1008.[5] The court further held that the FAA did not preempt its application of Washington law. In *Lowden v. T–Mobile USA, Inc.*, 512 F.3d 1213 (9th Cir.2008), the Ninth Circuit followed *Scott* in its application of Washington law, and agreed that the FAA did not preempt that application. The *Scott* court employed much of the same unconscionability and preemption analysis that the California Supreme Court had applied in *Discover Bank v. Superior Court*, 36 Cal.4th 148, 30 Cal.Rptr.3d 76, 113 P.3d 1100 (2005). *Discover Bank* concerned a challenge to the enforceability of ATTM's arbitration clause. The court held that an arbitration agreement in a consumer contract of adhesion is unconscionable under California law where the agreement permits neither class actions nor class arbitration. *Id.*, 30 Cal.Rptr.3d 76, 113 P.3d at 1110. It also held that the FAA did not preempt the application of this aspect of California law. *Id.* The Ninth Circuit reiterated that holding in several cases, including *Laster v. ATTM*, 584 F.3d 849 (9th Cir.2009). ATTM successfully petitioned the United States Supreme Court to review *Laster*. *ATTM v. Concepcion*, — U.S. —, 130 S.Ct. 3322, 176 L.Ed.2d 1218 (2010) (granting writ of certiorari).

When they moved to compel arbitration last year, both Verizon and ATTM included requests to stay these litigations pending the Supreme Court's resolution of

---

**5.** It has become all but obligatory, when discussing the potentially exculpatory effect of a class action waiver for consumer disputes, to cite Judge Posner's pithy explanation: "The *realistic* alternative to a class action is not 17 million individual suits, but zero individual disputes, as only a lunatic or a fanatic sues for $30." *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir.2004) (emphasis in original).

*Concepcion.* The court granted those requests. The Supreme Court issued its opinion in *Concepcion* in April. —— U.S. ——, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011). In a 5–4 ruling, the Court overruled the FAA preemption rulings in *Discover Bank* and *Laster.* The Court held that the application of state unconscionability law to invalidate an arbitration clause's class action waiver interfered with the FAA's fundamental purpose—enforcing arbitration clauses according to their terms. This court lifted the stay in these litigations and permitted the parties to file supplemental briefs addressing *Concepcion.* The court now considers whether to grant either Verizon's or ATTM's motion to compel arbitration of Plaintiffs' claims.[6]

## III. ANALYSIS

■ Before determining whether the Unicel and Verizon arbitration agreements are enforceable in light of *Concepcion,* the court must resolve Plaintiffs' arguments that they did not agree to arbitrate these particular disputes with their wireless providers. *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) ("[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute."). The Adams Plaintiffs contend that the arbitration clause to which they agreed does not give ATTM the right to request arbitration. They and Ms. Stoican also argue that the claims they raise are beyond the scope of the arbitration clauses at issue. Resolving these arguments requires the court to apply "federal substantive law of arbitrability." *Id.* (citation omitted). That law respects the "liberal federal policy favoring arbitration

agreements" embodied in the FAA. *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). That law requires the court to resolve "any doubts concerning the scope of arbitrable issues . . . in favor of arbitration," including any doubts about contract interpretation. *Id.* at 24–25, 103 S.Ct. 927.

### A. The Adams Plaintiffs Entered Contracts that Permit ATTM to Demand Arbitration.

First, the court considers the Adams Plaintiffs' threshold contention that the Unicel arbitration clause does not permit ATTM to invoke it. The key sentence is the first sentence of the arbitration clause:

> We (including our assignees, agents, employees, officers, directors, shareholders, parent companies, subsidiaries, affiliates, predecessors and successors) or you may elect to have any claim, dispute, or controversy ("Claim") of any kind (whether in contract, tort or otherwise) arising out of or relating to your Service or this agreement (including any renewals or extensions), any goods or services provided to you, any billing disputes between you and us, or any prior or future dealings between you and us resolved by binding arbitration.

Unicel Arb. Cl. ¶ 2(a). The first sentence of the Unicel agreement, which comes two sentences before the arbitration clause, declares that it will use the terms "Unicel," "we," or "us" to refer to Unicel. The parenthetical expansion of "we" in the first sentence of the arbitration clause, however, unambiguously overrides that prior definition, at least within that sentence. Thus, as long as ATTM is an assignee,

---

**6.** Ms. Stoican requests that the court again stay her case because Congress is considering amendments to the FAA that would overcome the ruling in *Concepcion.* Stoican Supp. Br. at 10 (pointing to draft Arbitration Fairness Act of 2011). The court denies her request. There is no evidence that Congress is likely to pass these amendments, much less that Congress would do so quickly enough to make a stay in these cases a reasonable option.

parent company, affiliate, or successor of Unicel, it is entitled to make an arbitration demand. The Adams Plaintiffs point out that ATTM is not an assignee of or successor to Unicel, because it was not ATTM who acquired their Unicel agreements, but rather ATTM's subsidiary New Cingular. Similarly, ATTM was not Unicel's parent company. Plaintiffs thus contend that ATTM cannot invoke the arbitration clause.

■ The court disagrees with the Adams Plaintiffs; it finds that ATTM can invoke their Unicel arbitration clauses. When New Cingular acquired the Unicel service agreements, it replaced Unicel as the contracting party in those agreements. No one argues otherwise. Once New Cingular did so, the first sentence of the arbitration clause effectively read as follows: "We, meaning New Cingular (including our assignees, agents, ... parent companies, ...) or you may elect...." There is no dispute that ATTM was New Cingular's parent company. It therefore became entitled to invoke the arbitration clause once New Cingular acquired the Unicel agreements. Any other reading leads to absurd results. For example, under the Adams Plaintiffs' interpretation, not even New Cingular could invoke the arbitration clause, because New Cingular was not the assignee of the agreements, but rather the assignee of the original assignee, Verizon. That interpretation is untenable, because it makes the agreement assignable once, and only once. Plaintiffs' suggestion that the parent company of a first assignee cannot invoke the clause fares no better.

## B. Plaintiffs' Claims are Within the Scope of the Applicable Arbitration Clauses.

The Adams Plaintiffs and Ms. Stoican both contend that their disputes are beyond the scope of the arbitration clause that applies to them. The court disagrees.

The Adams Plaintiffs' argument again turns on the first sentence of the Unicel arbitration clause. It extends to "any claim ... of any kind ... arising out of" a host of circumstances, including "any prior or future dealings between you and us." Unicel Arb. Cl. ¶ 2(a). The Adams Plaintiffs' unsolicited-text-messaging claims against ATTM arise out of "future dealings" with ATTM. They do not argue otherwise, they argue instead that the word "us" in the key sentence refers *only* to Unicel (or its successor). They base this interpretation on the first sentence of the Unicel agreement, which explains that the agreement will use "Unicel," "we," or "us" to refer to Unicel. Plaintiffs acknowledge that the first sentence of the arbitration clause parenthetically expands the meaning of "we," but they contend that the sentence did not similarly redefine "us," and thus the court should not interpret "us" as expansively. Defendants deride this interpretation as a grammatical flight of fancy, but the court does not share that view.

■ The court finds the meaning of "us" within the Unicel arbitration clause to be ambiguous. Even within the same sentence, "we" and "us" do not necessarily refer to the same set of people. For example, consider the second of the following two sentences: "I met Janet at noon. We (along with our friends) went to the courthouse because the judge wanted to speak with us." It is possible that the judge wanted to speak with Janet and the author, with their friends serving merely as moral support; it is also possible that the judge wanted to speak with Janet, the author, and their friends. Without more context, no one can say. In this case, the additional context of the Unicel agreement provides no answers. It is reasonable to conclude that Unicel meant the agreement to apply broadly to essentially any claim arising between a customer and Unicel or

any person or entity with a relationship with Unicel. It is also reasonable, however, to conclude that Unicel did not intend such an expansive interpretation. A consumer's dispute with a parent company might have nothing to do with wireless service, and Unicel might not have wished to submit those disputes to arbitration.

■ Despite the ambiguity in the arbitration clause, federal arbitrability law dictates that the dispute between the Adams Plaintiffs and ATTM is arbitrable. When courts consider two reasonable interpretations of an arbitration clause, one that requires arbitration of a particular dispute and one that does not, they must send the dispute to arbitration. *AT & T Techs., Inc. v. Commc'ns Workers of Am.,* 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) ("[I]t has been established that where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that [an] order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.") (internal quotation omitted). In this case, the Unicel arbitration clause is reasonably susceptible to an interpretation in which the Adams Plaintiffs' claims against ATTM are arbitrable. Accordingly, the court finds that the dispute they raise is within the scope of the arbitration clause.[7]

■ The Adams Plaintiffs contend that the court should not independently determine the scope of the Unicel arbitration clause, arguing instead that collateral estoppel requires this court to follow the ruling in *Porter v. ATTM,* a case pending in Chittenden County Superior Court in

Vermont. In *Porter,* pro se plaintiff Pike Porter, like the Adams Plaintiffs, sued ATTM contending that it violated the FCA and Vermont law by sending him unsolicited text messages. Like the Adams Plaintiffs, Mr. Porter was a Unicel customer. Unlike the Adams Plaintiffs, Mr. Porter did not seek to represent a class. On March 18, 2010, the *Porter* court concluded that "[b]ased on the undisputed fact that Porter did not become a customer of AT & T until 11/6/09, the court denies [ATTM's] motion [to compel arbitration]." Andrews Decl. (Dkt. #47), Ex. G. In a one-page order, the court explained that although the Unicel arbitration clause "could bind Porter and Unicel as to prior events between *them* as of the date it was agreed to, it cannot bind Porter with regard to events between him and AT & T that took place at a time when his only contract was with Unicel, not AT & T." *Id.* (emphasis in original). ATTM moved for reconsideration, arguing that although Mr. Porter might not have been an ATTM customer, ATTM owned his Unicel agreement during the time he received the unsolicited text messages. *Id.,* Exs. H & J (ATTM motion & reply). ATTM attached various documents to prove this point. *Id.,* Ex. H. The court denied the motion for reconsideration, explaining that while ATTM had proven that it acquired between 100,000 and 150,000 of Unicel's Vermont service agreements, it had not "establish[ed] that the acquisition included all Vermont Unicel contracts, or Mr. Porter's in particular." *Id.,* Ex. K (Jul. 9, 2010 order denying reconsideration) (emphasis in original).

■ A court considering the preclusive effect of a prior ruling applies the law of the jurisdiction that issued it. In Ver-

---

7. The court notes that the Unicel arbitration clause gives the parties the option to submit the question of whether a particular claim is arbitrable to an arbitrator. Unicel Agr. ¶ 2(a) ("A Claim may include ... the issue of wheth-

er any particular Claim must be submitted to arbitration....)" No party has invoked this portion of the clause with respect to their dispute over whether the Adams Plaintiffs' claims are arbitrable.

mont, a party can invoke issue preclusion only if it meets five conditions. It must assert preclusion against a party to the prior litigation or the party's privy; the issue must be one resolved in a final judgment on the merits; the issue must be identical to the one the asserting party raises in the subsequent action; the party to the prior litigation must have had a full and fair opportunity to litigate the issue; and the application of issue preclusion must be fair. *Trepanier v. Getting Organized*, 155 Vt. 259, 583 A.2d 583, 587 (1990). Moreover, when a party not present in a prior litigation asserts issue preclusion offensively against a party to the prior litigation, courts must be particularly mindful of fairness concerns. *Id.* at 587 n. 2.

Here, the court cannot be confident that the *Porter* court resolved any issue essential to this litigation. It is at least arguable that the court's first ruling was that Mr. Porter's dispute with ATTM was beyond the scope of the Unicel arbitration clause, thus agreeing with the same argument the Adams Plaintiffs make here. But in light of the court's ruling on reconsideration, it is arguable, even likely, that the court merely held that ATTM had failed to prove that it ever acquired Mr. Porter's Unicel contract. The Adams Plaintiffs cannot take refuge in that ruling, because they do not dispute ATTM's evidence that it acquired their Unicel agreements in December 2008.

The court declines to apply issue preclusion where it cannot be certain that the *Porter* court resolved the issue now before this court.[8] The court notes, moreover, that ATTM had a lesser incentive to litigate the *Porter* case because Mr. Porter was not attempting to represent a class of

all of ATTM's former Unicel customers in Vermont. Under these circumstances, it would not be fair to apply issue preclusion against ATTM.

■ The court next rejects Ms. Stoican's argument that her claim is beyond the scope of the Verizon arbitration clause because she could have brought it in a small claims court. The Verizon arbitration clause twice mentions small claims actions. Ms. Stoican cites only the first, which states as follows:

> The Federal Arbitration Act applies to this agreement, except for qualifying small claims court cases, any controversy or claim arising out of or relating to this agreement, ... or any product or service provided under or in connection with this agreement ... will be settled by one or more neutral arbitrators....

Verizon Arb. Cl. ¶ 1. She contends that the "plain reading" of this sentence is that "only claims that are in excess of the jurisdictional limit of the small claims court will be arbitrated." Stoican Supp. Br. (Dkt. # 19) at 8. The court does not agree. Moreover, Ms. Stoican's interpretation ignores the second paragraph of the Verizon clause, which states that the "complaining party can choose either the AAA's [arbitration procedures], an individual action in small claims court or the BBB's rules for binding arbitration." Verizon Arb. Cl. ¶ 2. This paragraph, coupled with the first paragraph of the clause, shows unequivocally that Verizon merely agreed to permit its customers to bring their disputes to small claims court rather than arbitrate them. Verizon did not agree to permit a customer to bring a claim in whatever court the customer prefers as long as the claim could be the subject of a small claims suit.

---

**8.** ATTM appealed the Porter ruling to the Vermont Supreme Court, which heard oral argument in March of this year. Although the Vermont Supreme Court's ruling will per-

haps clarify the basis on which ATTM's arbitration demand succeeds or fails, no one has asked this court to delay its ruling pending the Vermont Supreme Court's decision.

## C. Concepcion Dictates that the Court Must Enforce the Arbitration Clauses to Which Plaintiffs Are Bound.

■ Having established that the disputes that Plaintiffs raise are within the scope of the arbitration clauses and that their wireless providers are entitled to invoke those clauses, it remains to decide whether Plaintiffs may avoid the enforcement of the clauses. The FAA explains that arbitration agreement is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. State law may supply grounds for declaring a contract unenforceable, including state unconscionability law. *Doctor's Associates, Inc. v. Casarotto,* 517 U.S. 681, 686–87, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996). Federal law may also provide grounds for avoiding enforcement of an arbitration clause. For example, Congress may declare explicitly or implicitly that certain statutory claims are not subject to arbitration. *See, e.g., Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 26, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (considering whether federal Age Discrimination in Employment Act claims are arbitrable). Courts addressing this question often consider whether arbitration is "inconsistent with the ... framework and purposes" of the statute at issue. *Id.* at 27, 111 S.Ct. 1647. The court now considers whether either state or federal law provides a basis for declaring the Verizon or Unicel arbitration clauses unenforceable.

### 1. Concepcion Disposes of Plaintiffs' Contention that State Law Provides a Ground For Declaring Their Arbitration Agreements Unenforceable.

The decisions in *Discover Bank, Scott, Laster,* and *Lowden* embody the view that the FAA does not preempt state unconscionability law so long as that law applies to all contracts, not just arbitration contracts. Even before *Concepcion,* states could not explicitly single out arbitration contracts. For example, in *Perry v. Thomas,* 482 U.S. 483, 491, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987), the Court held that the FAA preempted a California statute declaring that suits to recover unpaid wages could not be arbitrated. In *Discover Bank* and cases like it, courts held that because *any* consumer contract that barred class resolution of a dispute would be unenforceable under state law whether it was an arbitration agreement or not, the FAA did not preempt this application of state law.

*Concepcion* is, at a minimum, the death knell for any application of state law that declares arbitration agreements unenforceable because they bar class actions and class arbitrations. The Court observed that even if the unconscionability rule in *Discover Bank* applied to all contracts, it had a "disproportionate impact on arbitration agreements." *Concepcion,* 131 S.Ct. at 1747. The Court explained that while § 2 of the FAA "preserves generally applicable contract defenses, nothing in it suggests an intent to preserve state-law rules that stand as an obstacle to the accomplishment of the FAA's objectives." *Id.* at 1748. What the Court called the "*Discover Bank* rule" ran afoul of this prohibition because "[r]equiring the availability of classwide arbitration interferes with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA." *Id.* One of the fundamental attributes of arbitration is that it allows the parties to "design[ ] ... efficient, streamlined procedures tailored to the type of dispute" that is likely to arise from a contract. *Id.* at 1749. To mandate class arbitration, in the court's view, was to mandate

a "slower, more costly" process, one that was "more likely to generate procedural morass than final judgment." *Id.* at 1751. It would also mandate "procedural formality," even where the parties had agreed otherwise. *Id.* Moreover, the court found that the risks to a corporate defendant inherent in class arbitration of consumer disputes greatly exceeded the risk of the individual arbitrations it had bargained for. *Id.* at 1752.

The court further observes that the decision in *Concepcion* did not depend on the relatively consumer-friendly terms of the ATTM arbitration agreement. In a final note, the *Concepcion* majority responded to a concern that the dissent raised: that "class proceedings are necessary to prosecute small-dollar legal claims that might otherwise slip through the legal system." 131 S.Ct. at 1753. As the court has noted, this concern animated the holdings in both *Scott* and *Discover Bank.* *Scott,* 161 P.3d at 1007 (contending that class actions are "often the only meaningful redress available for small but widespread injuries"); *Discover Bank,* 30 Cal.Rptr.3d 76, 113 P.3d at 1108–09. The *Concepcion* majority dismissed this concern with a single sentence: "States cannot require a procedure that is inconsistent with the FAA, even if it is desirable for other reasons." 131 S.Ct. at 1753. Thereafter, in what this court can only characterize as dicta, the majority remarked that the ATTM arbitration agreement was unlikely to exculpate ATTM from liability:

> Moreover, the claim here was most unlikely to go unresolved. As noted earlier, the arbitration agreement provides that AT & T will pay claimants a minimum of $7500 and twice their attorney fees if they obtain an arbitration award greater than AT & T's last settlement offer.

*Id.* The court finds nothing in *Concepcion* to support the notion that Court would have decided the case differently had it confronted a less consumer-friendly arbitration agreement.

■ Neither Ms. Stoican nor the Adams Plaintiffs articulate a state-law ground for declaring their arbitration agreements unenforceable that passes muster under *Concepcion.* The parties concede that they cannot avoid the agreements on state law grounds merely because they bar class actions. Ms. Stoican does not attempt to construct an alternate argument that Washington law bars enforcement of her arbitration agreement. The Adams Plaintiffs, by contrast, insist that despite *Concepcion,* Vermont law mandates the conclusion that the Unicel arbitration agreement is unconscionable.

■ Putting aside the preemptive sweep of the FAA, the court is skeptical that Vermont's courts would declare the Unicel Agreement to be unconscionable. Before *Concepcion,* Vermont's Supreme Court had not joined the chorus of states that declared class arbitration waivers to be unconscionable. *Fleming v. Kruziffer Motors, Inc.,* No. 440–9–06 Wmcv, 2007 Vt.Super. LEXIS 61, at *10 (Vt.Super.Ct. Jul. 20, 2007) (declining to consider whether class action prohibition is unconscionable in Vermont). Now that *Concepcion* prohibits state law that invalidates arbitration agreements because they contain class action waivers, Plaintiffs are effectively forced to argue that Vermont would invalidate the Unicel arbitration agreement even without the waiver. They have little support for that argument. Plaintiffs point to no authority from any state declaring unconscionable an arbitration agreement in a wireless service contract that does not contain a class action waiver. Vermont, like Washington and California, considers both the procedural and substantive unconscionability of a contract. *Maglin v. Tschannerl,* 174 Vt. 39, 800 A.2d 486, 491 (2002). A Vermont court will not in-

validate a contract merely because of the parties' unequal bargaining power. *Id.* at 490. Instead, it looks for evidence that the party with greater power forced substantively unreasonable terms on a party who had no meaningful choice but to accept them. *Id.* at 491. Even if the court accepts that the Adams Plaintiffs had no meaningful choice but to enter the Unicel agreement, it finds no substantively unconscionable terms in that agreement.[9] The agreement purports to waive any right to special or punitive damages, but it explicitly does so only to the extent the law allows such a waiver.[10] Unicel Arb. Cl. ¶ 15. The same is true of the agreement's waiver of the right to seek injunctive relief. *Id.* The agreement requires the consumer to bear up to $75 in arbitration costs, but this hardly seems an unconscionable burden. The agreement mandates the use of WIA Rules, rules which, so far as the court is aware, no court has ever held to be unconscionable. Moreover, ATTM has agreed to waive the terms of the Unicel Arbitration agreement and permit Plaintiffs to take advantage of the friendlier terms of the ATTM Agreement. Plaintiffs insist that ATTM cannot force them to arbitration in accordance with the Unicel agreement but then offer the more generous terms of the ATTM agreement for conducting that arbitration. The court sincerely doubts that any Vermont court would adopt their position. *See Ragone v. Atlantic Video,* 595 F.3d 115, 124 (2d Cir. 2010) (noting that New York law permits courts to accept waiver of portions of arbitration agreement before considering its unconscionability). In short, the court finds it unlikely, at best, that the Unicel arbitration agreement is unconscionable in Vermont, especially in light of ATTM's agreement not to enforce much of it.

Rather than rule on an issue of Vermont law, however, the court finds that Plaintiffs have not articulated any application of Vermont law that would survive the preemptive sweep of the FAA in light of *Concepcion.* Even before *Concepcion,* at least one Vermont court noted that the FAA constrained the application of Vermont law to invalidate an arbitration clause. In *Fleming,* the court observed that "almost any arbitration agreement in any consumer contract would seem to be logically suspect" under Vermont law, because the agreement will be a "contract[ ] of adhesion ... characterized by a disparity of power and a lack of meaningful choice on the part of the consumer." *Fleming,* 2007 Vt.Super. LEXIS 61, at *6–7. The court recognized, however, that it could not reach that conclusion where the "federal policy [expressed in the FAA] trumps any desires state legislatures and courts may have to protect their citizens from compelled arbitration." *Id.* at *7. Even if the Adams Plaintiffs had articulated an application of Vermont law that invalidated the Unicel agreement, that application would invalidate virtually any consumer arbitration agreement. The FAA, as the *Concepcion* Court interpreted it, does not permit that result.

## 2. Federal Law Does Not Invalidate These Arbitration Agreements.

Federal law, like state law, can also supply a ground for declaring an arbitra-

---

9. Plaintiffs argue that the Unicel agreement requires the consumer, not the wireless provider, to waive the right to a jury trial, full discovery, and other elements of a civil action. They are mistaken. The agreement permits either party to demand arbitration, and in that event, no party will have the right to a jury trial, discovery, or other aspects of a civil action.

10. ATTM contends that the arbitrator, not the court, should decide whether the agreement's limitation on special and punitive damages is enforceable. The court need not reach that argument in light of its disposition today.

tion agreement unenforceable. Congress can declare explicitly or implicitly that a federal statute creates a right to a judicial forum. *See Mitsubishi*, 473 U.S. at 628, 105 S.Ct. 3346; *see also Greenwood v. CompuCredit Corp.*, 615 F.3d 1204, 1209 (9th Cir.2010) (holding that "right to sue" for violations of federal Credit Repair Organization Act prohibits mandatory arbitration), *cert. granted*, — U.S. —, 131 S.Ct. 2874, 179 L.Ed.2d 1187 (2011).

■ Ms. Stoican argues that the FCA guarantees access to a judicial forum. She is mistaken. *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 727 (9th Cir. 2007) ("We ... hold that FCA claims may be subject to agreements to arbitrate."). For reasons she does not explain, Ms. Stoican does not cite *Lozano*, and urges the court to apply the *Greenwood* court's analysis to the FCA. Even if the court believed that the *Greenwood* analysis would lead to the conclusion that the FCA guarantees a judicial forum, the court could not ignore *Lozano*, whose holding is squarely to the contrary. 504 F.3d at 725–27.

Federal courts also recognize another federal ground for declaring an arbitration clause unenforceable: that the clause deprives the plaintiff of the ability to effectively vindicate a statutory right. The *Mitsubishi* Court provided the seeds of this vindication-of-statutory-rights defense. It considered an American manufacturer's attempt to avoid a clause mandating arbitration of virtually any dispute in Japan. *Mitsubishi*, 473 U.S. at 617, 105 S.Ct. 3346. The manufacturer asserted, among other counterclaims, a claim for violation of the Sherman Antitrust Act. *Id.* at 619–20, 105 S.Ct. 3346. It argued that public policy in favor of antitrust enforcement demanded that it not be forced into international arbitration. The Court disagreed, declining to assume that an international arbitration would not vindicate the manu-

facturer's antitrust claims. *Id.* at 636, 105 S.Ct. 3346. The Court noted that an arbitrator might well apply United States antitrust law. *Id.* at 636–37, 105 S.Ct. 3346. It explained that "so long as the prospective litigant effectively may vindicate its statutory cause of action, the statute will continue to serve both its remedial and deterrent function." *Id.* at 637, 105 S.Ct. 3346. It further explained that if the arbitrator construed the arbitration agreement in a way that "operated ... as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy." *Id.* at 637 n. 19, 105 S.Ct. 3346. Rather than speculate about the outcome of Japanese arbitration, it observed that a court could invalidate any award that violated public policy. *Id.* ("Mitsubishi seeks to enforce the agreement to arbitrate, not to enforce an award."); *see also* 9 U.S.C. §§ 9–10 (stating procedures for challenging an arbitral award in court).

The Supreme Court has recognized the *Mitsubishi* dicta as a potential basis for avoiding an arbitration agreement. In *Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 90, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000), the Court considered a consumer's argument that it should not enforce an arbitration agreement because the cost of arbitration would leave her unable to effectively vindicate her claims invoking the federal Truth in Lending Act and Equal Credit Opportunity Act. The court recognized the viability of her argument, but held she had not carried her burden to prove that the costs of arbitration were prohibitive:

> It may well be that the existence of large arbitration costs could preclude a litigant ... from effectively vindicating her federal statutory rights in the arbitral forum. But the record does not show that [the consumer in this case]

will bear such costs if she goes to arbitration.... The "risk" that [the consumer] will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement.

*Id.* at 90–91, 121 S.Ct. 513.

From *Mitsubishi* and *Green Tree* sprang numerous lower court decisions considering the vindication-of-statutory-rights defense to an arbitration agreement. In most instances, courts find that the party invoking the defense has not carried its burden to prove that the arbitration agreement effectively prevents the vindication of statutory rights. *See, e.g., In re Am. Express Merchants' Litig.,* 634 F.3d 187, 196–97 (2011) (citing cases from Fourth and Seventh Circuits). The Ninth Circuit has applied the defense to invalidate an arbitration clause that was inconsistent with the federal Petroleum Marketing Practices Act. *Graham Oil Co. v. ARCO Prods. Co.,* 43 F.3d 1244, 1247–48 (9th Cir.1994) (invalidating limits on exemplary damages, attorney fees and witness expenses, and statute of limitations); *id.* at 1249 (finding remainder of arbitration clause not severable from invalid portions). It has also acknowledged similar federal policy in concluding that the FAA does not preempt a state-law-based vindication-of-statutory-rights defense. *Ting v. AT & T Corp.,* 319 F.3d 1126, 1151 (9th Cir.2003) ("[P]arties that agree to arbitrate statutory claims still are entitled to basic procedural and remedial protections so that they can effectively realize their statutory rights.").

Plaintiffs hope to find refuge in *Am. Express,* where the Second Circuit found that the plaintiffs, a collection of merchants who accepted American Express

charge cards, had proven that requiring individual arbitration of their antitrust claims would deny them the ability to vindicate their statutory rights. The merchants invoked the Sherman Act, claiming that American Express's requirement that those who accept its charge cards must also accept its credit and debit cards was an illegal tying arrangement. *Id.* at 191–92. The plaintiffs provided a "detailed affidavit" from an economist who opined that even a merchant with yearly charge-card revenue of as much as $1.7 million per year could expect damages of only about $40,000. *Id.* at 198. The economist believed that the costs of obtaining that award would be prohibitive where the expert economic studies necessary to prove the antitrust claims would cost much more. *Id.* ("[I]t would not be worthwhile for an individual plaintiff ... to pursue individual arbitration or litigation where the out-of-pocket costs, just for the economic study and services, would be at least several hundred thousand dollars, and might exceed $1 million."). Finding that American Express had "brought no serious challenge" to the economist's opinion, the court found that the merchants had carried their burden of proving that the arbitration agreement's class action waiver effectively deprived them of the protection of federal antitrust law. *Id.* at 199. The court was careful to explain that class action waivers were not "per se unenforceable," but rather that courts must evaluate them on a case-by-case basis. *Id.*

Even assuming that the Ninth Circuit would apply the vindication-of-statutory-rights defense just as the *American Express* court did,[11] it would be of no benefit to either the Adams Plaintiffs or Ms. Stoi-

---

**11.** Some courts have questioned whether *Concepcion* implicitly limits the vindication-of-statutory-rights defense. *E.g., D'Antuono v. Serv. Road Corp.,* 789 F.Supp.2d 308, 339 (D.Conn.2011) ("[T]he Court knows of no

principled reason why federal law rules that have essentially the same purpose and effect as the *Discover Bank* rule would continue to be permissible after [*Concepcion* ].").

can. No Plaintiff has shown that their arbitration agreement deprives them of the opportunity to vindicate their statutory claims.

 The Adams plaintiffs contend that the Unicel arbitration agreement's limitation on discovery, damages, and injunctive relief make them unable to vindicate their FCA claims. They fall well short of proving as much. As the court has noted, the Unicel Agreement dictates that an arbitrator cannot enforce the damages limitation or bar on injunctive relief if doing so would be contrary to law. The Adams Plaintiffs make no attempt to prove that an arbitrator would not follow the law. As to the agreement's limitation on discovery, Plaintiffs do not explain why they need more than limited discovery to prove the crux of their claim—that they received unsolicited text messages from ATTM. Nothing in the record suggests that any of the Adams Plaintiffs would be unable to obtain evidence necessary to support their claims in an individual arbitration. Indeed, given that ATTM has offered to substitute the terms of its arbitration agreement, which contains none of the limitations identified above, the Adams Plaintiffs will be hard-pressed to prove that they cannot vindicate their statutory rights in arbitration.

 Ms. Stoican similarly fails to prove that the Verizon arbitration agreement deprives her of the ability to vindicate her FCA rights.[12] Like the Adams Plaintiffs, she points to the Verizon agreement's limits on damages. Like the Adams Plaintiffs, she fails to recognize that the agreement provides for enforcement of those limits only if the law allows. She also attempts to follow the path that the *American Express* merchants charted, providing an affidavit from an expert witness who opines that arbitration would be prohibitively expensive. Telecommunications industry expert Charles Clapsaddle opines that the cost of proving that Verizon's charges to Ms. Stoican for its Navigator services were a "systematic problem" would be "tens of thousands of dollars." Clapsaddle Decl. ¶¶ 11–13. What neither Mr. Clapsaddle nor Ms. Stoican acknowledges is that she has no need to prove that Verizon's overcharging was a "systematic problem." Nothing in the FCA requires her to prove that Verizon systematically charges customers for Navigator service that they did not request. It merely requires her to prove that *she* was charged for a service that she did not request. There is no evidence in the record that she cannot effectively prove this in arbitration.

## IV. CONCLUSION

For the reasons stated above, the court GRANTS ATTM's motion to compel arbitration (Dkt. # 37) and DENIES its motion to seal (Dkt. # 60). The court directs the clerk to UNSEAL the document at Docket No. 62. The court GRANTS ATTM's motion (Dkt. # 67) for leave to file an additional brief, because the court's consideration of that unsolicited brief (and Plaintiffs' unsolicited brief in response) prejudiced no party.

No party has requested that the court stay this proceeding pending arbitration. *See* 9 U.S.C. § 3. The court accordingly directs the clerk to DISMISS this action, without prejudice to the resolution of Plaintiffs' claims in arbitration.

---

12. Ms. Stoican does not argue that the arbitration agreement effectively deprives her of the ability to vindicate her Washington law claims, including her CPA claim. *But see In re DirecTV Early Cancellation Fee Litig.*, No. ML 09–2093 AG (ANx), 810 F.Supp.2d 1060, 1071–73, 2011 WL 4090774 at *9–11, 2011 U.S. Dist. LEXIS 102027, at *35–39 (C.D.Cal. Sept. 6, 2011) (holding that arbitration agreement effectively prevented plaintiffs from vindicating right to act as "private attorney general" to enforce two California statutes).

The court will enter a separate order memorializing its decision to compel arbitration in Ms. Stoican's case against Verizon, No. C 10–1017RAJ.