(Slip Opinion) OCTOBER TERM, 2011 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## COMPUCREDIT CORP. ET AL. *v.* GREENWOOD ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 10–948.   Argued October 11, 2011—Decided January 10, 2012

Although respondents' credit card agreement required their claims to be resolved by binding arbitration, they filed a lawsuit against petitioner CompuCredit Corporation and a division of petitioner bank, alleging, *inter alia*, violations of the Credit Repair Organizations Act (CROA). The Federal District Court denied the defendants' motion to compel arbitration, concluding that Congress intended CROA claims to be nonarbitrable. The Ninth Circuit affirmed.

*Held:* Because the CROA is silent on whether claims under the Act can proceed in an arbitrable forum, the Federal Arbitration Act (FAA) requires the arbitration agreement to be enforced according to its terms. Pp. 2–10.

  (a) Section 2 of the FAA establishes "a liberal federal policy favoring arbitration." *Moses H. Cone Memorial Hospital* v. *Mercury Constr. Corp.*, 460 U. S. 1, 24. It requires that courts enforce arbitration agreements according to their terms. See *Dean Witter Reynolds Inc.* v. *Byrd*, 470 U. S. 213, 221. That is the case even when federal statutory claims are at issue, unless the FAA's mandate has been "overridden by a contrary congressional command." *Shearson/American Express Inc.* v. *McMahon*, 482 U. S. 220, 226. Pp. 2–3.

  (b) The CROA provides no such command. Respondents contend that the CROA's disclosure provision—which requires credit repair organizations to provide consumers with a statement that includes the sentence " 'You have a right to sue a credit repair organization that violates the [Act],' " 15 U. S. C. §1679c(a)—gives consumers the right to bring an action in a court of law; and that, because the CROA prohibits the waiver of "any right of the consumer under this subchapter," §1679f(a), the arbitration agreement's waiver of the "right" to bring a court action cannot be enforced. Respondents' premise is

Syllabus

flawed.  The disclosure provision creates only a right for consumers to receive a specific statement describing the consumer protections that the law elsewhere provides, one of which is the right to enforce a credit repair organization's "liab[ility]" for "fail[ure] to comply with [the Act]."  §1679g(a).  That provision does not override the FAA's mandate.  Its mere contemplation of judicial enforcement does not demonstrate that the Act provides consumers with a "right" to initial judicial enforcement.  Pp. 3–8.

   (c) At the time of the CROA's enactment in 1996, arbitration clauses such as the one at issue were no rarity in consumer contracts generally, or in financial services contracts in particular.  Had Congress meant to prohibit these very common provisions in the CROA, it would have done so in a manner less obtuse than what respondents suggest.  Pp. 8–9.

615 F. 3d 1204, reversed and remanded.

   SCALIA, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, THOMAS, BREYER, and ALITO, JJ., joined.  SOTOMAYOR, J., filed an opinion concurring in the judgment, in which KAGAN, J., joined.  GINSBURG, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 10–948

COMPUCREDIT CORPORATION, ET AL., PETITIONERS
*v.* WANDA GREENWOOD ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[January 10, 2012]

JUSTICE SCALIA delivered the opinion of the Court.

We consider whether the Credit Repair Organizations Act (CROA), 15 U. S. C. §1679 *et seq.*, precludes enforcement of an arbitration agreement in a lawsuit alleging violations of that Act.

I

Respondents are individuals who applied for and received an Aspire Visa credit card marketed by petitioner CompuCredit Corporation and issued by Columbus Bank and Trust, now a division of petitioner Synovus Bank. In their applications they agreed to be bound by a provision which read: "Any claim, dispute or controversy (whether in contract, tort, or otherwise) at any time arising from or relating to your Account, any transferred balances or this Agreement (collectively, 'Claims'), upon the election of you or us, will be resolved by binding arbitration . . . ." App. 62.

In 2008, respondents filed a class-action complaint against CompuCredit and Columbus in the United States District Court for the Northern District of California, alleging, as relevant here, violations of the CROA. The

claims largely involved the defendants' allegedly misleading representation that the credit card could be used to rebuild poor credit and their assessment of multiple fees upon opening of the accounts, which greatly reduced the advertised credit limit.

The District Court denied the defendants' motion to compel arbitration of the claims, concluding that "Congress intended claims under the CROA to be nonarbitrable." 617 F. Supp. 2d 980, 988 (2009). A panel of the United States Court of Appeals for the Ninth Circuit affirmed, Judge Tashima dissenting. 615 F. 3d 1204 (2010). We granted certiorari, 563 U. S. ___ (2011).

## II

The background law governing the issue before us is the Federal Arbitration Act (FAA), 9 U. S. C. §1 *et seq.*, enacted in 1925 as a response to judicial hostility to arbitration. *AT&T Mobility LLC* v. *Concepcion*, 563 U. S. ___, ___ (2011) (slip op., at 4). As relevant here, the FAA provides:

> "A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U. S. C. §2.

This provision establishes "a liberal federal policy favoring arbitration agreements." *Moses H. Cone Memorial Hospital* v. *Mercury Constr. Corp.*, 460 U. S. 1, 24 (1983). See also, *e.g.*, *Concepcion, supra*, at __ (slip op., at 4); *Gilmer* v. *Interstate/Johnson Lane Corp.*, 500 U. S. 20, 25 (1991). It requires courts to enforce agreements to arbitrate according to their terms. See *Dean Witter Reynolds Inc.* v. *Byrd*, 470 U. S. 213, 221 (1985). That is the case even when the claims at issue are federal statutory claims, unless the

FAA's mandate has been "overridden by a contrary congressional command." *Shearson/American Express Inc.* v. *McMahon*, 482 U. S. 220, 226 (1987). See also *Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.*, 473 U. S. 614, 628 (1985). Respondents contend that the CROA contains such a command.

That statute regulates the practices of credit repair organizations, defined as certain entities that offer services for the purpose of "(i) improving any consumer's credit record, credit history, or credit rating; or (ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i)."[1] 15 U. S. C. §1679a(3). In its principal substantive provisions, the CROA prohibits certain practices, §1679b, establishes certain requirements for contracts with consumers, §1679d, and gives consumers a right to cancel, §1679e. Enforcement is achieved through the Act's provision of a private cause of action for violation, §1679g, as well as through federal and state administrative enforcement, §1679h.

### III

Like the District Court and the Ninth Circuit, respondents focus on the CROA's disclosure and nonwaiver provisions. The former, which is reproduced in full in the Appendix, *infra,* sets forth a statement that the credit repair organization must provide to the consumer before any contract is executed. §1679c(a). One sentence of that required statement reads, "'You have a right to sue a credit repair organization that violates the Credit Repair Organization Act.'" The Act's nonwaiver provision states,

---

[1] The District Court said that petitioners do not dispute that they come within this definition. See 617 F. Supp. 980, 984, n. 2 (ND Cal. 2009). The Ninth Circuit did not address that issue, see 615 F. 3d 1204, 1207, n. 3 (2010), nor do we.

"Any waiver by any consumer of any protection provided by or any right of the consumer under this subchapter— (1) shall be treated as void; and (2) may not be enforced by any Federal or State court or any other person." §1679f(a).

The Ninth Circuit adopted the following line of reasoning, urged upon us by respondents here: The disclosure provision gives consumers the "right to sue," which "clearly involves the right to bring an action in a court of law." 615 F. 3d, at 1208. Because the nonwaiver provision prohibits the waiver of "any right of the consumer under this subchapter," the arbitration agreement—which waived the right to bring an action in a court of law— cannot be enforced. *Id.*, at 1214.

The flaw in this argument is its premise: that the disclosure provision provides consumers with a right to bring an action in a court of law. It does not. Rather, it imposes an obligation on credit repair organizations to supply consumers with a specific statement set forth (in quotation marks) in the statute. The only consumer right it *creates* is the right to receive the statement, which is meant to describe the consumer protections that the law *elsewhere* provides. The statement informs consumers, for instance, that they can dispute the accuracy of information in their credit file and that "'[t]he credit bureau must then reinvestigate and modify or remove inaccurate or incomplete information.'" 15 U. S. C. §1679c(a). That description is derived from §1681i(a), which sets out in great detail the procedures to be followed by a credit bureau in the event of challenges to the accuracy of its information. Similarly, the required statement informs consumers that they may "'cancel your contract with any credit repair organization for any reason within 3 business days from the date you signed it'"—the right created and set forth in more detail in §1679e. And the "right to sue" language describes the consumer's right to enforce the credit repair organization's

"liab[ility]" for "fail[ure] to comply with any provision of this subchapter" provided for in §1679g(a).[2]  Thus, contrary to the dissent's assertion, our interpretation does not "[r]educ[e] the required disclosure to insignificance," *post*, at 6.  The disclosure provision informs consumers of their right to enforce liability for *any* failure to conform to the statute—information they might otherwise not possess.  It is the dissent's interpretation that effectively reduces a portion of the CROA to a nullity.  Interpreting the "right to sue" language in §1679c(a) to "create" a right to sue in court not only renders it strikingly out of place in a section that is otherwise devoted to giving the consumer notice of rights created elsewhere; it also renders the creation of the "right to sue" elsewhere superfluous.

Respondents suggest that the CROA's civil-liability provision, §1679g (set forth in full in the Appendix, *infra*), demonstrates that the Act provides consumers with a "right" to bring an action in court.  They cite the provision's repeated use of the terms "action," "class action," and "court"—terms that they say call to mind a judicial proceeding.  These references cannot do the heavy lifting that respondents assign them.  It is utterly commonplace for statutes that create civil causes of action to describe the details of those causes of action, including the relief available, in the context of a court suit.  If the mere formulation of the cause of action in this standard fashion were sufficient to establish the "contrary congressional com-

---

[2] Accordingly, when a consumer sues to enforce liability under the CROA, he does so under §1679g(a), not "in light of §1679c," *post*, at 4 (GINSBURG, J., dissenting).  An action under the CROA need not refer to §1679c at all, unless it is based on the company's failure to provide the statement required under that section.  Section 1679g(a) creates the "right" at issue and describes it in detail not contained in §1679c's summary.  When determining the scope of that right, it is therefore §1679g(a)—and not §1679c—that must govern.

mand" overriding the FAA, *McMahon*, *supra*, at 226, valid arbitration agreements covering federal causes of action would be rare indeed. But that is not the law. In *Gilmer* we enforced an arbitration agreement with respect to a cause of action created by the Age Discrimination in Employment Act of 1967 (ADEA) which read, in part: "Any person aggrieved may bring a civil action in any court of competent jurisdiction for such legal or equitable relief as will effectuate the purposes of this chapter." 29 U. S. C. §626(c)(1). In *McMahon* we enforced an arbitration agreement with respect to a cause of action created by a provision of the Racketeer Influenced and Corrupt Organizations Act (RICO) which read, in part: "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit . . . ." 18 U. S. C. §1964(c). And in *Mitsubishi Motors* we enforced an arbitration agreement with respect to a cause of action created by a provision of the Clayton Act which read, in part: "[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U. S. C. §15(a). Thus, we have repeatedly recognized that contractually required arbitration of claims satisfies the statutory prescription of civil liability in court. See *Gilmer*, 500 U. S., at 28; *McMahon*, 482 U. S., at 240; *Mitsubishi Motors*, 473 U. S., at 637. To be sure, none of the statutes described above contained a nonwaiver provision, as the statute before us does. But if a cause-of-action provision mentioning judicial enforcement does not create a right to initial judicial enforcement, the waiver of initial judicial enforcement is not the waiver of a "right of the consumer," §1679f(a). It

takes a considerable stretch to regard the nonwaiver provision as a "congressional command" that the FAA shall not apply.[3]

Moreover, if one believes that §1679g's contemplation of court suit (combined with §1679f(a)) establishes a nonwaivable right to initial judicial enforcement, one must also believe that it establishes a nonwaivable right to initial judicial enforcement in *any* competent judicial tribunal, since it contains no limitation. We think it clear, however, that this mere "contemplation" of suit in any competent court does not *guarantee* suit in all competent courts, disabling the parties from adopting a reasonable forum-selection clause. And just as the contemplated availability of all judicial forums may be reduced to a single forum by contractual specification, so also can the contemplated availability of judicial action be limited to judicial action compelling or reviewing initial arbitral adjudication. The parties remain free to specify such matters, so long as the *guarantee* of §1679g—*the guarantee of the legal power to impose liability*—is preserved.

Respondents and the dissent maintain that if the CROA does not create a right to a judicial forum, then the disclosure provision effectively requires that credit repair organizations mislead consumers. We think not. The disclosure provision is meant to describe the law to consumers in a manner that is concise and comprehensible to the layman—which necessarily means that it will be imprecise. The required statement says, for example, that the CROA "'prohibits deceptive practices by credit repair organiza-

---

[3] *Gilmer* noted that the ADEA had been amended after conclusion of the arbitration agreement in that case to preclude waiver of "rights or claims that may arise after the date the waiver is executed." 29 U. S. C. §626(f)(1)(C). The Court said in dictum that this provision "did not explicitly preclude arbitration or other nonjudicial resolution of claims," 500 U. S., at 29.

tions,'" 15 U. S. C. §1679c(a).  This is in some respects an overstatement, and in some respects an understatement, of the "Prohibited practices" set forth in §1679b.  It would include, for example, deception apart from "the offer or sale of the services of the credit repair organization," §1679b(a)(4).  Yet we would not hold, in order to prevent the required statement from being "misleading," that a consumer has a right to be protected from deceptive practices beyond those actually covered by §1679b.  So also with respect to the statement's description of a "right to sue."  This is a colloquial method of communicating to consumers that they have the legal right, enforceable in court, to recover damages from credit repair organizations that violate the CROA.  We think most consumers would understand it this way, without regard to whether the suit in court has to be preceded by an arbitration proceeding.  Leaving that possibility out may be imprecise, but it is not misleading—and certainly not so misleading as to demand, in order to avoid that result, reading the statute to contain a guaranteed right it does not in fact contain.

## IV

At the time of the CROA's enactment in 1996, arbitration clauses in contracts of the type at issue here were no rarity.  Quite the contrary, the early 1990's saw the increased use of arbitration clauses in consumer contracts generally, and in financial services contracts in particular.  See Ware, Arbitration and Unconscionability After *Doctor's Associates, Inc.* v. *Casarotto*, 31 Wake Forest L. Rev. 1001, 1001, and n. 3 (1996); J. Shimabukuro, Congressional Research Service Report for Congress, The Federal Arbitration Act: Background and Recent Developments 1 (2002).

Had Congress meant to prohibit these very common provisions in the CROA, it would have done so in a manner less obtuse than what respondents suggest.  When it

has restricted the use of arbitration in other contexts, it has done so with a clarity that far exceeds the claimed indications in the CROA. See, *e.g.*, 7 U. S. C. §26(n)(2) (2006 ed., Supp. IV) ("No predispute arbitration agreement shall be valid or enforceable, if the agreement requires arbitration of a dispute arising under this section"); 15 U. S. C. §1226(a)(2) (2006 ed.) ("Notwithstanding any other provision of law, whenever a motor vehicle franchise contract provides for the use of arbitration to resolve a controversy arising out of or relating to such contract, arbitration may be used to settle such controversy only if after such controversy arises all parties to such controversy consent in writing to use arbitration to settle such controversy"); cf. 12 U. S. C. §5518(b) (2006 ed., Supp. IV) (granting authority to the newly created Consumer Financial Protection Bureau to regulate predispute arbitration agreements in contracts for consumer financial products or services).[4] That Congress would have sought to achieve the same result in the CROA through combination of the nonwaiver provision with the "right to sue" phrase in the disclosure provision, and the references to "action" and

———————

[4] The dissent questions the relevance of these statutes, since they postdated the CROA and since this Court's intervening decisions compelling arbitration "increasingly alerted Congress to the utility of drafting antiwaiver prescriptions with meticulous care." *Post*, at 8. But as the dissent implicitly recognizes, Congress had been "alerted" much before these post-CROA statutes were passed. The CROA itself followed a series of this Court's seminal decisions compelling arbitration, decisions which held that the FAA had established a "federal policy favoring arbitration," *Gilmer* v. *Interstate/Johnson Lane Corp.*, 500 U. S. 20, 26 (1991), and that "[t]he burden is on the party opposing arbitration . . . to show that Congress intended to preclude a waiver of judicial remedies," *Shearson/American Express Inc.* v. *McMahon*, 482 U. S. 220, 227 (1987). To the extent Congress is ever "stimulated" by this Court's decisions, *post*, at 8, there is no reason to think the Congress that enacted the CROA was any less stimulated than subsequent Congresses.

"court" in the description of damages recoverable, is unlikely.

*   *   *

Because the CROA is silent on whether claims under the Act can proceed in an arbitrable forum, the FAA requires the arbitration agreement to be enforced according to its terms. The judgment of the Ninth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

## APPENDIX

Section 1679c provides:

**"(a) Disclosure required**

"Any credit repair organization shall provide any consumer with the following written statement before any contract or agreement between the consumer and the credit repair organization is executed:

### "'Consumer Credit File Rights Under State and Federal Law

"'You have a right to dispute inaccurate information in your credit report by contacting the credit bureau directly. However, neither you nor any 'credit repair' company or credit repair organization has the right to have accurate, current, and verifiable information removed from your credit report. The credit bureau must remove accurate, negative information from your report only if it is over 7 years old. Bankruptcy information can be reported for 10 years.

"'You have a right to obtain a copy of your credit report from a credit bureau. You may be charged a reasonable fee. There is no fee, however, if you have been turned down for credit, employment, insurance, or a rental dwelling because of information in your credit report within the preceding 60 days. The credit bureau must provide someone to help you interpret the information in your credit file. You are entitled to receive a free copy of your credit report if you are unemployed and intend to apply for employment in the next 60 days, if you are a recipient of public welfare assistance, or if you have reason to believe that there is inaccurate information in your credit report due to fraud.

"'You have a right to sue a credit repair organization that violates the Credit Repair Organization Act. This law prohibits deceptive practices by credit repair organizations.

"'You have the right to cancel your contract with any credit repair organization for any reason within 3 business days from the date you signed it.

"'Credit bureaus are required to follow reasonable procedures to ensure that the information they report is accurate. However, mistakes may occur.

"'You may, on your own, notify a credit bureau in writing that you dispute the accuracy of information in your credit file. The credit bureau must then reinvestigate and modify or remove inaccurate or incomplete information. The credit bureau may not charge any fee for this service. Any pertinent information and copies of all documents you have concerning an error should be given to the credit bureau.

"'If the credit bureau's reinvestigation does not resolve the dispute to your satisfaction, you may send a brief statement to the credit bureau, to be kept in your file, explaining why you think the record is inaccurate. The credit bureau must include a summary of your statement about disputed information with any report it issues about you.

"'The Federal Trade Commission regulates credit bureaus and credit repair organizations. For more information contact:

> "'The Public Reference Branch
> "'Federal Trade Commission
> "'Washington, D. C. 20580'.

**"(b) Separate statement requirement**

"The written statement required under this section shall be provided as a document which is separate from any written contract or other agreement between the credit repair organization and the consumer or any other written material provided to the consumer.

## "(c) Retention of compliance records

### "(1) In general

"The credit repair organization shall maintain a copy of the statement signed by the consumer acknowledging receipt of the statement.

### "(2) Maintenance for 2 years

"The copy of any consumer's statement shall be maintained in the organization's files for 2 years after the date on which the statement is signed by the consumer."

\*     \*     \*

Section 1679g provides:

## "(a) Liability established

"Any person who fails to comply with any provision of this subchapter with respect to any other person shall be liable to such person in an amount equal to the sum of the amounts determined under each of the following paragraphs:

### "(1) Actual damages

"The greater of—

"(A) the amount of any actual damage sustained by such person as a result of such failure; or

"(B) any amount paid by the person to the credit repair organization.

### "(2) Punitive damages

### "(A) Individual actions

"In the case of any action by an individual, such additional amount as the court may allow.

### "(B) Class actions

"In the case of a class action, the sum of—

"(i) the aggregate of the amount which the court may allow for each named plaintiff; and

"(ii)  the aggregate of the amount which the court may allow for each other class member, without regard to any minimum individual recovery.

**"(3)  Attorneys' fees**

"In the case of any successful action to enforce any liability under paragraph (1) or (2), the costs of the action, together with reasonable attorneys' fees.

**"(b)  Factors to be considered in awarding punitive damages**

"In determining the amount of any liability of any credit repair organization under subsection (a)(2) of this section, the court shall consider, among other relevant factors—

"(1)  the frequency and persistence of noncompliance by the credit repair organization;

"(2)  the nature of the noncompliance;

"(3)  the extent to which such noncompliance was intentional; and

"(4)  in the case of any class action, the number of consumers adversely affected."

# SUPREME COURT OF THE UNITED STATES

_____

No. 10–948

_____

COMPUCREDIT CORPORATION, ET AL., PETITIONERS
_v._ WANDA GREENWOOD ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[January 10, 2012]

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN joins,
concurring in the judgment.

Claims alleging the violation of a statute, such as the
Credit Repair Organizations Act (Act), 15 U. S. C. §1679
_et seq._, are generally subject to valid arbitration agree-
ments unless Congress evinces a contrary intent in the
text, history, or purpose of the statute. See _Gilmer_ v.
_Interstate/Johnson Lane Corp._, 500 U. S. 20, 26 (1991). I
agree with the Court that Congress has not shown that
intent here. But for the reasons stated by the dissent, I
find this to be a much closer case than the majority opin-
ion suggests.

The Act creates a cause of action in its liability provi-
sion, see §1679g(a), denominates the cause of action a
"right to sue" in the mandatory disclosure statement,
§1679c(a), and then provides that "right[s]" may not be
waived, §1679f(a). Those for whom Congress wrote the
Act—lay readers "of limited economic means and . . .
inexperienced in credit matters," §1679(a)(2)—reasonably
may interpret the phrase "right to sue" as promising a
right to sue _in court_. And it is plausible to think that
Congress, aware of the impact of its words, intended such
a construction of the liability provision.

But while this interpretation of the Act is plausible, it is
in my view no more compelling than the contrary con-

struction that petitioners urge. As the majority opinion notes, the disclosure provision does not itself confer a cause of action, and the liability provision that does is materially indistinguishable from other statutes that we have held not to preclude arbitration. In my mind this leaves the parties' arguments in equipoise, and our precedents require that petitioners prevail in this circumstance. This is because respondents, as the opponents of arbitration, bear the burden of showing that Congress disallowed arbitration of their claims, and because we resolve doubts in favor of arbitration. See *id.,* at 26. Of course, if we have misread Congress' intent, then Congress can correct our error by amending the statute.

I add one more point. The majority opinion contrasts the liability provision of the Act with other, more recently enacted statutes that expressly disallow arbitration. I do not understand the majority opinion to hold that Congress must speak so explicitly in order to convey its intent to preclude arbitration of statutory claims. We have never said as much, and on numerous occasions have held that proof of Congress' intent may also be discovered in the history or purpose of the statute in question. See *ibid.* ("If such an intention exists, it will be discoverable in the text of the [statute], its legislative history, or an 'inherent conflict' between arbitration and the [statute's] underlying purposes"); *Shearson/American Express Inc.* v. *McMahon*, 482 U. S. 220, 227 (1987) ("If Congress did intend to limit or prohibit waiver of a judicial forum for a particular claim, such an intent 'will be deducible from [the statute's] text or legislative history,' or from an inherent conflict between arbitration and the statute's underlying purposes" (quoting *Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.*, 473 U. S. 614, 628 (1985); citation omitted)). I agree with the dissent that the statutes the majority opinion cites shed little light on the thoughts of the Congress that passed the Act. But the Act's text is not

dispositive, and respondents identify nothing in the legislative history or purpose of the Act that would tip the balance of the scale in favor of their interpretation.

# SUPREME COURT OF THE UNITED STATES

No. 10–948

COMPUCREDIT CORPORATION, ET AL., PETITIONERS
*v.* WANDA GREENWOOD ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[January 10, 2012]

JUSTICE GINSBURG, dissenting.

Congress enacted the Credit Repair Organizations Act (CROA) to protect consumers "who have experienced credit problems"—"particularly those of limited economic means"—against the unfair and deceptive practices of credit repair organizations. 15 U. S. C. §1679(a). Central to the legislation, Congress sought to arm consumers with information needed to make intelligent decisions about purchasing a repair organization's services. To that end, Congress directed that, "before [execution of] any contract . . . between [a] consumer and [a] credit repair organization," the organization must make certain disclosures. One of the required disclosures reads:

> "You have a right to sue a credit repair organization that violates the [CROA]. This law prohibits deceptive practices by [such] organizations." §1679c(a).

The Act's civil-liability provision describes suits consumers may bring in court: individual and class actions for damages (actual and punitive) and attorneys' fees. A further provision renders void any purported waiver of any protection or right the Act grants to consumers.

The Court today holds that credit repair organizations can escape suit by providing in their take-it-or-leave-it contracts that arbitration will serve as the parties' sole

dispute-resolution mechanism. The "right to sue," the Court explains, merely connotes the vindication of legal rights, whether in court or before an arbitrator. That reading may be comprehensible to one trained to "think like a lawyer." But Congress enacted the CROA with vulnerable consumers in mind—consumers likely to read the words "right to sue" to mean the right to litigate in court, not the obligation to submit disputes to binding arbitration.

In accord with the Ninth Circuit, I would hold that Congress, in an Act meant to curb deceptive practices, did not authorize credit repair organizations to make a false or misleading disclosure—telling consumers of a right they do not, in fact, possess. If the Act affords consumers a nonwaivable right to sue in court, as I believe it does, a credit repair organization cannot retract that right by making arbitration the consumer's sole recourse.

I

CompuCredit marketed a credit card to consumers with weak credit ratings. It did so through massive direct-mail and Internet solicitations, urging recipients to acquire a card under the brand name Aspire Visa, and thereby "rebuild poor credit" and "improve [their] credit rating." App. 40, Complaint ¶11 (internal quotation marks omitted). Plaintiffs, individuals who applied for and received CompuCredit's card, sought redress for multiple violations of the CROA.

Their complaint alleged that CompuCredit's promotional materials told potential customers that no deposit would be required, and that cardholders would receive, upfront, a credit line of $300. In fact, plaintiffs asserted, they were charged an initial finance fee of $29, a monthly fee of $6.50, and an annual fee of $150, assessed immediately against the $300 limit. In the aggregate, plaintiffs calculated, fees charged the first year amounted to $257.

CompuCredit's fee exactions did appear in the promotional materials: in small print, buried amidst other information, and removed from the clearer representation that no deposit would be required. *Id.*, at 40–41, Complaint ¶¶12–13. Far from improving their credit rating, plaintiffs complained, CompuCredit knew that its card, saddled with these fees, "would not provide any meaningful assistance whatsoever with regard to rebuilding credit and improving a credit rating." *Id.*, at 48, Complaint ¶41(b). Furthermore, plaintiffs stated, CompuCredit did not provide them with the written disclosures of their rights required by the CROA. *Id.*, at 42, Complaint ¶23.

Seeking damages for the alleged violations, along with attorneys' fees, plaintiffs requested class certification. In the District Court and Court of Appeals, they successfully resisted CompuCredit's motion to compel arbitration pursuant to a form contract that barred class proceedings.[1] This Court, however, interprets the CROA to permit CompuCredit's demand that plaintiffs proceed, if at all, before an arbitrator.[2] I read the governing statute differently.

## II

Three sections of the CROA, considered together, indicate Congress' intention to preclude mandatory, creditor-imposed, arbitration of CROA claims. See 15 U. S. C. §§1679c(a), 1679g, and 1679f. Before entering into any

---

[1] The contract signed by cardholders did not itself require arbitration. Rather, it incorporated by reference an "enclosed insert" providing that all disputes would be resolved by arbitration at the discretion of CompuCredit or the cardholder. App. 61–63.

[2] CompuCredit's form contract specified that arbitration was to occur under the auspices of the National Arbitration Forum (NAF). In 2009, after the Attorney General of Minnesota filed an action alleging that NAF had engaged in numerous violations of consumer-protection laws, NAF entered into a consent decree barring it from handling consumer arbitrations. See Press Release by Lori Swanson, Attorney General of Minnesota (July 19, 2009).

consumer contract, credit repair organizations must give potential customers a written statement of rights they possess under that Act and related consumer-protection laws. §1679c(a). Congress dictated every word of the required notification. Credit repair organizations must tell consumers, in plain terms, how they may enforce their rights: "You have a right to sue a credit repair organization that violates the Credit Repair Organization Act." *Ibid.*

The "right to sue" refers to the claim for relief Congress afforded consumers in §1679g. "Any person" who violates another's rights under the CROA "shall be liable" for actual damages and attorneys' fees, and may be liable for punitive damages as well. §1679g(a)(1)–(3). The Act sets out the factors "the court shall consider" in determining the amount of punitive damages "the court may allow" aggrieved consumers to recover, either individually or as a class. §1679g(a)(2) and (b). The liability created here, in §1679g, is precisely what the consumer, in light of §1679c, may sue to enforce.

The Act renders void and unenforceable "[a]ny waiver by any consumer of any protection provided by or *any right* of the consumer under this subchapter." §1679f (emphasis added).[3] The rights listed in §1679c(a) rendered nonwaivable by §1679f are the "right to sue" and the "right to cancel [a] contract . . . for any reason within 3 business days from the date [the consumer] signed it."[4]

––––––––––

[3] Section 1679f(a), omitted from the Court's statutory appendix, *ante*, at 11–14, provides in full:

"Any waiver by any consumer of any protection provided by or any right of the consumer under this subchapter—

"(1) shall be treated as void; and

"(2) may not be enforced by any Federal or State court or any other person."

[4] Two provisions, although described by §1679c(a) as consumer "right[s]," are not rendered nonwaivable by §1679f because they are not "right[s] . . . under this subchapter." Rather, the "right to dispute

The question on which this case turns is what Congress meant when it created a nonwaivable "right to sue." Recall that Congress' target audience in the CROA is not composed of lawyers and judges accustomed to nuanced reading of statutory texts, but laypersons who receive a disclosure statement in the mail. Recall, as well, Congress' findings that these individuals are often "of limited economic means and . . . inexperienced in credit matters." §1679(a)(2). Attributing little importance to this context, the Court construes the right to sue as "the legal right, enforceable in court, to recover damages . . . without regard to whether the suit in court has to be preceded by an arbitration proceeding." *Ante*, at 8. I read Congress' words without that sophisticated gloss: The right to sue, I would hold, means the right to litigate in court.

The Court is quite right in recognizing that consumers "have the legal right, enforceable in court, to recover damages from credit repair organizations that violate the CROA." *Ibid.* But the Court is quite wrong, as I see it, to characterize as merely "imprecise," *ibid.*, Congress' failure to include the caveat that access to court may be conditioned upon an anterior arbitration. The "right to sue" may well be "a colloquial method of communicating to consumers." See *ibid.* But it surely is not colloquially *understood* by recipients of the required disclosures as the right, not to adjudicate in court, but only to seek, or defend against, court enforcement of an award rendered by the arbitrator chosen by the credit repair organization. Few, if any, credit repair customers would equate the "right to

———————

inaccurate information in your credit report" and the "right to obtain a copy of your credit report" referred to in §1679c(a) are rights conferred elsewhere in the U. S. Code. See §1681i(a), §1681j. Section 1679f also makes nonwaivable the "*protection[s]* provided . . . under this subchapter" (emphasis added); these protections include the prohibition of certain business practices, see §1679b, and the provision, in writing, of certain contractual terms and conditions, see §1679d.

sue," §1679c(a), with the extremely limited judicial review given to an arbitrator's award, see, *e.g.*, *Hall Street Associates, L. L. C.* v. *Mattel, Inc.*, 552 U. S. 576, 586–589 (2008).

The Court discounts the references to "action," "class action," and "court" in §1679g, the provision that "create[s]" the consumers' claim for relief. See *ante*, at 5. Despite similar statutory language, the Court observes, we have enforced arbitration agreements to settle disputes arising under other Acts of Congress. The CROA, however, is distinguished by its disclosure requirements, prime among them, the obligation imposed on the credit repair organization to inform potential customers they "have a right to sue" an organization that violates the Act. §1679c(a). Yet the Court refuses to read this language in concert with §1679g, notwithstanding our frequent acknowledgment that "a statute is to be read as a whole, since the meaning of statutory language . . . depends on context." *King* v. *St. Vincent's Hospital*, 502 U. S. 215, 221 (1991) (citation omitted). As just explained, I believe Congress meant what an ordinary reader of the disclosure requirement would likely comprehend: A credit repair organization that engages in deceptive practices may be sued *in court*.

Reducing the required disclosure to insignificance, see *ante*, at 4–5, the Court's construction of the CROA scarcely advances the Act's goals. Congress aimed to ensure prospective customers "are provided with the information necessary to make an informed decision," and also to "protect the public from unfair or deceptive advertising and business practices." 15 U. S. C. §1679(b). The Court's interpretation, however, enables the very deception Congress sought to suppress. Today's decision permits credit repair organizations to deny consumers, through fine print in a contract, an important right whose disclosure is decreed in the U. S. Code.

This unfortunate result is not compelled by our precedents. The Court cites three decisions for the proposition, by now uncontroversial, that the mere existence of a statutory right of action does not preclude agreements to arbitrate disputes. See *ante*, at 5–6 (citing *Gilmer* v. *Interstate/Johnson Lane Corp.*, 500 U. S. 20, 28 (1991); *Shearson/American Express Inc.* v. *McMahon*, 482 U. S. 220, 240 (1987); and *Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.*, 473 U. S. 614, 637 (1985)). As the Court acknowledges, *ante*, at 6, none of the statutes at issue in those cases contained a nonwaiver clause analogous to §1679f. Yet the presence of such a clause would not have affected the outcome, the Court maintains; a nonwaiver provision would not have precluded arbitration because the statutes conferred no underlying right to proceed in court.

Precisely the point: The CROA differs from the statutes we have construed in the past in just that respect. The Act does not merely create a claim for relief. It designates that claim as an action entailing a "right to sue"; mandates that consumers be informed, prior to entering any contract, of that right; and precludes the waiver of any "right" conferred by the Act. Neither *Gilmer*, *McMahon*, nor *Mitsubishi* construed a statute of a similar order.[5]

## III

The Court's final point is that, elsewhere, Congress has spoken with particular clarity in guaranteeing a judicial

---

[5] "[I]f one believes [the CROA] . . . establishes a nonwaivable right to initial judicial enforcement," the Court states, "one must also believe that it establishes a nonwaivable right to initial judicial enforcement in *any* competent judicial tribunal." *Ante*, at 7. In Sportin' Life's words, "it ain't necessarily so." While there is good reason to believe Congress cared about the *institutional* location of consumers' suits under the CROA, there is no reason to think Congress sought to disturb the personal jurisdiction and venue rules that determine in which court a civil action may be brought.

forum and proscribing arbitration, but here, it did not do so. The two statutes the Court cites as exemplary post-date the CROA's enactment by 14 and 6 years, respective-ly. (A third merely delegates regulatory authority over certain arbitration agreements.) See *ante*, at 9. Notably, these recent statutes were framed following a string of this Court's decisions compelling arbitration pursuant to contractual stipulations.[6] Our decisions have increasingly alerted Congress to the utility of drafting antiwaiver prescriptions with meticulous care. But the Congress that drafted the CROA was not similarly stimulated, and we cannot fairly assess that enactment in the light of subse-quent legislative responses to developments unknown to the CROA's drafters. Cf. *United States* v. *Price*, 361 U. S. 304, 313 (1960) ("[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.").

Beyond question, the Federal Arbitration Act, "standing alone," favors the enforcement of arbitration agreements. *McMahon*, 482 U. S., at 226. To depart from that rule, however, Congress need not employ "magic words." See Tr. of Oral Arg. 6. In determining whether the Arbitration Act's general rule has been displaced by another statutory prescription, it remains our responsibility to examine carefully "the text of the [statute], its legislative history," and Congress' "underlying purposes." *Gilmer*, 500 U. S., at 26 (citing *McMahon*, 482 U. S., at 227). See also *14 Penn Plaza LLC* v. *Pyett*, 556 U. S. 247, 258 (2009) (arbi-tration agreements will be enforced "unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue" (quoting *Gilmer*, 500 U. S., at 26, in turn quoting *Mitsubishi*, 473 U. S., at 628)). No "unmistakably clear" statement is

---

[6] See Brief for American Association for Justice as *Amicus Curiae* 12, and n. 5 (listing arbitration decisions since the CROA's enactment).

necessary to proscribe the arbitration clause CompuCredit seeks to enforce.

*     *     *

The CROA mandates that potential customers shall be told of their "right to sue a credit repair organization" for damages arising from deceptive practices. 15 U. S. C. §1679c(a). But CompuCredit's adhesion contract provided that consumers would "not have the right to go to court." App. 61 (capitalization omitted). Congress' direction must prevail over CompuCredit's opposing declaration. Accordingly, I would affirm the judgment of the Court of Appeals for the Ninth Circuit.